# Exhibit A

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BLANK ROME LLP**
MICHAEL A. IANNUCCI (Pa. ID. No. 206169)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500
Fax: (215) 569-5555
Email: Iannucci@BlankRome.com

**BLANK ROME LLP**
JUSTIN F. LAVELLA (*pro hac vice* forthcoming)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 420-2200
Fax: (202) 420-2201
Email: JLavella@blankrome.com

*Attorneys for Plaintiffs Greenwood Racing Inc.,*
*Greenwood Gaming and Entertainment, Inc.,*
*Racetrack Op Co., City Turf Club Op Co., Turf*
*Club Op Co., and ACRA Turf Club, LLC.*

|  |  |  |
|---|---|---|
| GREENWOOD RACING INC., GREENWOOD GAMING AND ENTERTAINMENT, INC., RACETRACK OP CO., CITY TURF CLUB OP CO., TURF CLUB OP CO., and ACRA TURF CLUB, LLC | : : : : : : | IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA |
|  | : | ACTION FOR |
| Plaintiffs, | : | DECLARATORY JUDGMENT |
| v. | : : | No. _____ |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and STEADFAST INSURANCE COMPANY, | : : : : : | |
| Defendants. | : : | |

## COMPLAINT

Plaintiffs Greenwood Racing Inc., Greenwood Gaming and Entertainment, Inc., Racetrack

Op Co., City Turf Club Op Co., Turf Club Op Co., and ACRA Turf Club, LLC (collectively

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

"Greenwood") complain of Defendants American Guarantee and Liability Insurance Company ("American Guarantee") and Steadfast Insurance Company ("Steadfast," and collectively with American Guarantee, "Zurich") and allege upon knowledge as to its own acts, and upon information and belief as to the acts and omissions of others, as follows:

## NATURE OF THIS ACTION

1.      Domiciled in Pennsylvania, Greenwood Racing Inc. is a gaming and entertainment company that through its subsidiaries owns and operates a casino, a racetrack, and other wagering facilities in Pennsylvania and New Jersey, including Parx Casino, the largest casino gaming complex in Pennsylvania.

2.      Greenwood Gaming and Entertainment, Inc., Racetrack Op Co., City Turf Club Op Co., Turf Club Op Co., and ACRA Turf Club, LLC are the operating companies under Greenwood Racing Inc. that operate the facilities for which insurance coverage is sought.

3.      By this Action, Greenwood seeks to resolve an insurance coverage dispute as to the scope of coverage provided by its Zurich EDGE™ All-Risks Commercial Property Policies for the 2019-2020 and 2020-2021 policy periods (individually, the "2019-2020 Property Policy" and "2020-2021 Property Policy," and collectively, the "Property Policies") and its Z Choice™ Real Estate Environmental Liability Policy for the 2017-2020 policy period ("Pollution Policy," and collectively with the Property Policies, "Policies") for losses suffered and continuing to be suffered due to the Coronavirus[1] pandemic and the related governmental actions (including the various

---

[1] The terms "Coronavirus" and "Covid-19" are often used interchangeably in common parlance. Technically, Coronavirus is a virus and Covid-19 is a disease that is caused by Coronavirus. *See* ¶ 83 *infra*.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

governmental stay-at-home and business closure guidance and orders) in Pennsylvania and New Jersey.

4.    Greenwood's operations have been suspended and threatened, and continue to be restricted and threatened by the ongoing dangerous conditions created by the Coronavirus pandemic.

5.    Beginning in mid-March 2020 and continuing through the present, Greenwood has been forced to close or limit operations at various Greenwood properties in order to avoid the near certain risks of danger and harm to its employees and customers and physical loss or damage to its covered properties presented by the Coronavirus.

6.    Greenwood also continues to expend substantial costs to prevent the spread of Coronavirus, and, in instances where Coronavirus may have been present at its premises, additional costs to clean and disinfect for Coronavirus.

7.    Greenwood purchased the Policies from Zurich for the express purpose of obtaining broad, multi-risk protection for precisely these types of catastrophic loss.

8.    Befitting the top dollar that Greenwood paid for best-in-class insurance coverage, the Policies promise to afford broad coverages, including without limitation protections against the risks of pandemic-related losses.

9.    As explained in greater detail below, each of the Policies provides numerous independent, yet often overlapping, coverages that each insure different types of eventualities and are separately triggered by different factual circumstances of Greenwood's multi-faceted losses.

10.    First, the Property Policies provide distinct coverages for, among other eventualities (a) loss or damage to Greenwood's real and personal property; (b) "Time Element" (business interruption) loss resulting from a suspension of Greenwood's business activities;

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(c) Time Element loss caused by order of "civil or military authority"; (d) Time Element loss resulting from prevention of "ingress or egress" to a covered location; and (e) Time Element loss caused by the discovery of a "Notifiable Disease" at or near a covered location.

11.     Each of these coverages is triggered by a "Covered Cause of Loss," which is defined by Zurich as "[a]ll *risks of* direct physical loss of or damage from any cause unless excluded" (emphasis added).  Under the Property Policies' express terms, therefore, coverage is provided to Greenwood where, among other circumstances, Greenwood's physical use of its property was diminished or restricted to prevent the *risk* of spreading Coronavirus and the *risk* of loss of or damage to its property.  In such instances, Greenwood has been deprived of the physical use of its premises.

12.     Zurich contends that the coverage it owes to Greenwood is limited to an amendatory endorsement in the 2019-2020 Property Policy that provides business interruption coverage after discovery of a "Notifiable Disease" ("Notifiable Disease Endorsement").

13.     Zurich rejects any obligation to compensate Greenwood for the other physical loss of property and business interruption that has been suffered because of the substantial "risks" caused by Coronavirus, even though their Policies expressly provide coverage for such "risks."

14.     As acknowledged by Zurich, Greenwood has incurred and continues to incur losses caused by the presence of Coronavirus at certain of its properties.  But Greenwood also has incurred and continues to incur substantial additional losses resulting from the *risks* posed to property and persons at Greenwood locations by the widespread physical prevalence of Coronavirus in the communities where Greenwood operates.  Prior to mitigation efforts being implemented, these risks rendered the covered premises, at least temporarily, dangerous and/or unfit for their intended purposes, causing Greenwood extreme financial detriment.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

15.     Second, the Pollution Policy provides coverage for costs and loss of business income where, as here, Greenwood incurs "cleanup costs" due to a "pollution event" discovered during the policy period.

16.     Although Greenwood incurred and continues to incur such "cleanup costs" due to a "pollution event," as those terms are defined by the Pollution Policy, Zurich has denied that such circumstances occurred and contends that no coverage is owed under the Pollution Policy.

17.     Zurich was aware when it sold the Policies of Greenwood's intent to obtain full coverage for its casino, racetrack, and wagering facilities, including for losses resulting from the threat posed by the spread of a notifiable disease.  Accordingly, Greenwood's losses are covered under multiple applicable coverage parts of all of the Policies, and are not subject to any exclusions.

18.     Zurich has nevertheless wrongfully and unreasonably refused to reimburse Greenwood for the vast majority of its pandemic-related losses.

19.     Greenwood comes before this Court seeking, a judicial declaration confirming that: (a) the various coverage provisions identified herein are triggered by Greenwood's pandemic-related losses; (b) no exclusion applies to bar coverage for Greenwood's insurance claim; and (c) Zurich must honor its duties under the Policies, including its duty to pay for Greenwood's covered pandemic-related losses subject solely to the Policies' respective limits of liability.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction pursuant to 42 Pa.C.S. § 931(a).  This Court has the power to declare the parties' rights and obligations pursuant to 42 Pa.C.S. § 7532.

21.     Venue is proper pursuant to Pennsylvania Rule of Civil Procedure Rule 1006 and 42 Pa.C.S. § 931(c) because Defendants' business activities within this County subject them to

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

personal jurisdiction and a substantial part of the transactions or occurrences giving rise to the claim occurred in this County, including, *inter alia*, the delivery of the Policies and the breach thereof.

## THE PARTIES

22.     Plaintiff Greenwood Racing Inc. is a Delaware corporation with its principal place of business and headquarters in Bensalem, Pennsylvania. At all times relevant hereto, Greenwood Racing Inc. maintained insurance, including the Policies, to protect itself and its subsidiaries' property and business in the event of various losses.

23.     Plaintiff Greenwood Gaming and Entertainment, Inc. is a Delaware corporation with its principal place of business in Bensalem, Pennsylvania, that operates the Parx Casino. Greenwood Gaming and Entertainment, Inc. is a direct or indirect subsidiary of Greenwood Racing Inc.

24.     Plaintiff Racetrack Op Co. is a Delaware corporation with its principal place of business in Bensalem, Pennsylvania, that operates Parx Racing. Racetrack Op Co. is a direct or indirect subsidiary of Greenwood Racing Inc.

25.     Plaintiff City Turf Club Op Co. is Delaware corporation with its principal place of business in Philadelphia, Pennsylvania, that operates South Philadelphia Race & Sportsbook. City Turf Club Op Co. is a direct or indirect subsidiary of Greenwood Racing Inc.

26.     Plaintiff Turf Club Op Co. is a Delaware corporation with its principal place of business in Bensalem, Pennsylvania, that operated Oaks Race & Sportsbook. Turf Club Op Co. is a direct or indirect subsidiary of Greenwood Racing Inc.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

27.     Plaintiff ACRA Turf Club, LLC is a New Jersey limited liability company with its principal place of business in Bensalem, Pennsylvania, that operates Favorites at Egg Harbor Township.  ACRA Turf Club, LLC is a direct or indirect subsidiary of Greenwood Racing Inc.

28.     Defendant American Guarantee and Liability Insurance Company is a New York corporation with its principal place of business in Schaumburg, Illinois, and is licensed to transact, and is regularly transacting, business in the Commonwealth of Pennsylvania.

29.     Defendant Steadfast Insurance Company is an Illinois corporation with its principal place of business in Schaumburg, Illinois, and is a surplus lines insurer eligible to, and is regularly transacting, business in the Commonwealth of Pennsylvania.

30.     Defendants American Guarantee and Steadfast are subsidiaries of Zurich Insurance Group Ltd. and are referred to collectively herein as "Zurich."

## GREENWOOD'S COVERED PROPERTY AND OPERATIONS

31.     Greenwood owns and operates a casino, racetrack, and other wagering properties that are insured locations under the Policies.

32.     Parx Casino, located in Bensalem, Pennsylvania, is a full-service casino with slot machines, table games, food and beverage services (including restaurants, bars, and drink service to patrons on the casino floor), an entertainment center, and a sports book.  For the reasons set forth herein, Parx Casino was closed to the public from March 15, 2020, through June 28, 2020, and from December 12, 2020, through January 3, 2021.

33.     Parx Racing located in Bensalem, Pennsylvania, operates live horse racing 3 days per week year-round, off track wagering, and food and beverage services (including a restaurant and bar).  The property contains a backstretch with barns holding approximately 1,300 horses and dormitories for 120 individuals.  For the reasons set forth herein, Parx Racing was closed to the

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

public from March 13, 2020, through July 5, 2020, and from December 12, 2020, through January 3, 2021.

34.     South Philadelphia Race & Sportsbook, located in Philadelphia, Pennsylvania, operates off track wagering and sports betting.  For the reasons set forth herein, South Philadelphia Race & Sportsbook was closed to the public from March 15, 2020, through August 23, 2020, and from November 20, 2020, through January 7, 2021.

35.     Oaks Race & Sportsbook, located in Oaks, Pennsylvania, operated off track wagering and sports betting.  For the reasons set forth herein, Oaks Race & Sportsbook was closed to the public on March 13, 2020.  On or about June 29, 2020, it was decided that Oaks Race & Sportsbook would not be reopened.

36.     Favorites at Egg Harbor Township, located in Egg Harbor Township, New Jersey, operates off track betting.  For the reasons set forth herein, Favorites at Egg Harbor Township was closed to the public from March 15, 2020, through August 31, 2020.

## THE ZURICH PROPERTY INSURANCE POLICIES

37.     Beginning with its introduction in 2008, Zurich has marketed the EDGE™ policy form as offering "broader coverage and greater flexibility."  The CEO of Zurich's Global Corporate in North America business unit specifically lauded the form's clarity.

38.     In exchange for substantial premiums, the 2019-2020 Property Policy obligates Zurich to provide up to $850,000,000 of policy limits per occurrence, excess of any applicable deductible for the policy period of April 1, 2019, to April 1, 2020.

39.     A true and correct copy of Zurich's 2019-2020 Property Policy is attached hereto as **Exhibit A** and incorporated by reference.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

40.     In exchange for substantial premiums, the 2020-2021 Property Policy obligates Zurich to provide up to $1,000,000,000 of policy limits per occurrence, excess of any applicable deductible for the policy period of April 1, 2020, to April 1, 2021.

41.     A true and correct copy of Zurich's 2020-2021 Property Policy is attached hereto as **Exhibit B** and incorporated by reference.

42.     Aside from the policy period and certain limits of liability, the 2019-2020 Property Policy is substantively identical to the 2020-2021 Property Policy in all relevant respects to Greenwood's pandemic-related losses.

43.     The Property Policies both name Greenwood Racing Inc. as the "First Named Insured," and define the term "Insured" to include "any subsidiary of the First Named Insured." Exhibits A & B, at Declarations.

44.     The Property Policies cover "Insured Locations," which includes the Scheduled Locations in Pennsylvania and New Jersey for which Greenwood seeks coverage:  (1) 3001 Street Road, Bensalem, PA 19020 (Parx Racing); (2) 2999 Street Road, Bensalem, PA 19020 (Parx Casino); (3) 700 Packer Avenue, Philadelphia, PA 19148 (South Philadelphia Race & Sportsbook); (4) 600 Cresson Boulevard, Oaks, PA 19331 (Oaks Race and Sportsbook); and (5) 6055 E Black Horse Pike, Egg Harbor Township, NJ 08360 (Favorites at Egg Harbor Township).

45.     On information and belief, Zurich possesses extensive knowledge of the casino and sports wagering businesses in general.  In addition, Zurich engaged, or had reasonable opportunities to engage in, an extensive underwriting investigation in connection with the issuance of the Policies to become familiar with and knowledgeable about the nature and scope of

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Greenwood's business and the nature of the risks against which Greenwood was insuring, including the threat posed by the spread of a notifiable disease.

### *The Property Policies Are Triggered by the Risk of Physical Loss of Property*

46.     The Insuring Agreement set forth in the Property Policies provides, in relevant part, that Zurich "[i]nsures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location. . . ."

47.     The term "Covered Cause of Loss" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

48.     Therefore, the Property Policies expressly insure "[a]ll risks," such as, threats "of direct physical loss of or damage to" Greenwood's covered properties, unless such risk is explicitly and unambiguously "excluded."

49.     Although the Insurance Services Office ("ISO"), which is the insurance industry's drafting organization, had issued revised and more restrictive language eliminating the phrase "risks of" from the standard definition for "Covered Causes of Loss," Zurich nevertheless chose to continue to utilize the broader, unmodified definition of "Covered Cause of Loss" in the Property Policies.

50.     Specifically, in 2013, ISO revised the "Covered Causes of Loss" definition in its standard "Businessowners Coverage Forms," such as ISO form BP 00 03 07 13, from "[r]isks of direct physical loss unless the loss is . . . [e]xcluded" to the more restrictive "[d]irect physical loss unless the loss is excluded."

51.     When adopting this new language, ISO also issued a "Notice to Policyholders" that insurers employing the new language could provide to its insureds to explain the changes in policy

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

wording.  This notice expressly highlights that "the term 'risk of' is removed from the Covered Cause of Loss provision."

52.     Since at least 2013, various insurers have utilized this more restrictive definition of "Covered Causes of Loss" in their first-party property policies.  For example, Cincinnati Insurance Company, in revising its standard property policy form number FM 101, issued a "Notice to Policyholders" in 2016 stating:  "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101."

53.     Zurich chose not to include this more restrictive definition in the Property Policies that it sold to Greenwood for very substantial premiums.

54.     As used in the Property Policies, the term "physical loss of" must have a separate, distinct, and independent meaning from the term "damage" or the phrase would be redundant and superfluous.  Therefore, the Property Policies cover the "risk" of direct physical "loss" _or_ "damage" to Greenwood's property.

55.     Consequently, even if Greenwood's properties did not suffer physical "damage," the Property Policies still provide coverage for the risk of Greenwood's physical "loss" of its property.

56.     The Property Policies do not define "direct."

57.     The Property Policies do not define "physical."

58.     The Property Policies do not define "loss" or "loss of."

59.     The Property Policies do not define "damage."

60.     The Property Policies do not define the term "risks of."

61.     Therefore, the Property Policies do not define either the individual components of or the full phrase "risks of direct physical loss of or damage."

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

62.     When undefined by Zurich, the phrases "direct physical loss of or damage" and "risks of direct physical loss of or damage" are susceptible to more than one reasonable interpretation.

63.     When the undefined phrases "direct physical loss of or damage" and "risks of direct physical loss of or damage" are susceptible to more than one reasonable interpretation, they should be construed in accordance with the reasonable expectations of an average policyholder and against the drafting insurer, which, here, is Zurich.

64.     The reasonable expectation of an average policyholder is often informed by the dictionary definitions of key words or phrases used in an insurance policy.

65.     For example, dictionary definitions of "loss" include:

   a.   "Deprivation."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

   b.   "[D]ecrease in amount, magnitude, or degree." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

   c.   "The fact that you no longer have something or have less of something."  Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

   d.   "Having less than before."  Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss

   e.   "[T]he state of no longer having something or as much of something." Loss, Oxford Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

66.     At minimum, Greenwood suffered a "deprivation," "decrease" or "having less" of property because of the Coronavirus pandemic.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

67.     Based on Zurich's promise to cover "all risks of direct physical loss," Greenwood reasonably expected Zurich to provide coverage where, as here, the risk or threat of harm from Coronavirus to persons or property caused Greenwood to suffer loss by being deprived of physical use of its property.

68.     At minimum, Zurich must provide coverage for Greenwood's physical "loss of" its properties because Greenwood's properties have been made unusable, unsafe, and unfit for their intended purposes.

### *The Property Policies Have Multiple, Independent Coverages*

69.     The Property Policies contain multiple independent, yet overlapping, coverages for specific types of loss that might be suffered by Greenwood.  These separate coverages include the following, which are each potentially relevant to some or all of Greenwood's pandemic-related losses:

70.     **Property Damage:**  Zurich promised and agreed to insure Greenwood's interest in real and personal property located at or within 1,000 feet of an Insured Location, unless such property is "not covered" or an exclusion applies.  Exhibits A & B, Section III ¶ 3.01 – 3.02.

71.     **Time Element:**  Zurich promised and agreed to "pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**…."  Exhibits A & B, Section IV ¶ 4.01.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

72.     Zurich's potential responsibility for Greenwood's combined "Property Damage" and "Time Element" losses covered by the 2019-2020 Property Policy is that policy's full $850,000,000 limit of liability.

73.     Zurich's potential responsibility for Greenwood's combined "Property Damage" and "Time Element" losses covered by the 2020-2021 Property Policy is that policy's full $1,000,000,000 limit of liability.

74.     **Extra Expense:** Zurich promised and agreed to "pay for the reasonable and necessary Extra Expenses incurred by the Insured, during the Period of Liability**,** to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**." Exhibits A & B, Section IV ¶ 4.02.03.

75.     The term "Extra Expense" is defined by Zurich to mean "that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**."

76.     Zurich's potential responsibility for Greenwood's "Extra Expense" losses covered by the 2019-2020 Property Policy is $50,000,000, that policy's "Extra Expense" sublimit of liability.

77.     Zurich's potential responsibility for Greenwood's "Extra Expense" losses covered by the 2020-2021 Property Policy is also $50,000,000, that policy's "Extra Expense" sublimit of liability.

Case# 2021-01216-0 - JUDGE39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

78.    **Civil or Military Authority**:  Zurich promised and agreed to "pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured's Location as stated in the Declarations."  Exhibits A & B, Section V ¶ 5.02.03.

79.    The distance stated in both of the Property Policies' Declarations is 1 mile.

80.    Zurich's potential responsibility for Greenwood's losses covered by the 2019-2020 Property Policy's "Civil or Military Authority" provisions is the losses incurred in a 90-day period not to exceed that policy's $10,000,000 sublimit of liability.

81.    Zurich's potential responsibility for Greenwood's losses covered by the 2020-2021 Property Policy's "Civil or Military Authority" provisions is also the losses incurred in a 90-day period not to exceed that policy's $10,000,000 sublimit of liability.

82.    **Ingress/ Egress**:  Zurich promised and agreed to "pay for the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by the Insured or insured under this Policy and located within the distance of the Insured Location as stated in the Declarations."  Exhibits A & B, Section V ¶ 5.02.15.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania. Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

83.     The distance stated in both of the Property Policies' Declarations is 1 mile.

84.     Zurich's potential responsibility for Greenwood's losses covered by the 2019-2020 Property Policies' "Ingress/Egress" provisions is the losses incurred in a 30-day period not to exceed that policy's $10,000,000 sublimit of liability.

85.     Zurich's potential responsibility for Greenwood's losses covered by the 2020-2021 Property Policies' "Ingress/Egress" provisions is also the losses incurred in a 30-day period not to exceed that policy's $10,000,000 sublimit of liability.

86.     **Notifiable Disease:** Zurich promised and agreed to pay for "actual Time Element loss" from:

> "(A) the cancellation by guests and/or customers of bookings for accommodation or
>
> (B) a cessation or diminution of trade due to loss of potential customers as a direct result of the interruption of or interference with the business at a **location** insured by this policy.
>
> In consequence of:
>
> I.     The discovery of a Notifiable Disease at that **location** or within a 5 mile radius thereof or attributable to food or drink supplied from that **location**, which causes restrictions on the use of that **location** on the order of the competent local authority;
> II.    The discovery of vermin or pests at the **location** which causes restrictions on the use of that **location** on the order of the competent local authority;
> III.   Any accident causing defects in the drains or other sanitary arrangements a **location** which causes restrictions on the use of that **location** on the order of the competent local authority;
> IV.    Any occurrence of murder, suicide, rape, attempted rape or armed robbery at a **location**."

Exhibit A, at Endorsement 04; Exhibit B, at Endorsement – "Loss of Attraction."

87.     The term "Notifiable Disease" is defined by Zurich to mean:   "Any human infectious or human contagious disease (excluding Acquired Immune Deficiency Syndrome), an outbreak of which the competent local authority has stipulated shall be notified to them." *Id.*

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

88.   The Notifiable Disease Endorsement in the 2019-2020 Property Policy also confirms that losses covered under its terms may also be covered under other provisions of the Property Policies, including those set forth above, by the inclusion of the following language foreclosing potential double recovery:   "No coverage is provided under this endorsement if provided elsewhere in the policy."  Exhibit A, at Endorsement 04.

89.   Zurich's potential responsibility for Greenwood's losses covered by the 2019-2020 Property Policy's "Notifiable Disease" provisions is $5,000,000, that policy's "Notifiable Disease" sublimit of liability.

90.   Zurich's potential responsibility for Greenwood's losses covered by the 2020-2021 Property Policy's "Notifiable Disease" provisions is $1,000,000, that policy's "Notifiable Disease" sublimit of liability.

## THE ZURICH POLLUTION POLICY

91.   Beginning with its introduction in 2008, Zurich companies marketed the Z Choice™ Real Estate Environmental Liability policy form as having an "easy policy format to make complex business decisions simpler.  It is easy to understand, and the declarations page quickly shows what is covered." [2]

92.   In exchange for substantial premiums, Zurich's Pollution Policy obligates it to provide up to $15,000,000 of policy limits per occurrence and in the aggregate, excess of any applicable deductible for the policy period of April 1, 2017, to April 1, 2020.

---

[2] See "Zurich North America Commercial rolls out Z Choice environmental liability policy," available at http://www.zurichservices.com/zus/zna_config.nsf/pages/e775387993e8a7fd85257432005d5607!OpenDocument&Click= (last visited February 6, 2021).

17

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

93.    A true and correct copy of Zurich's Pollution Policy is attached hereto as **Exhibit C** and incorporated by reference.

94.    The Property Policy names Greenwood Racing Inc. as the "Named Insured," and further defines "Named Insured" to include "all subsidiary companies, limited liability companies or partnerships of such person or entity who own, operate or manage a 'covered location'." Exhibit C, at Declarations; *id.*, Section III, Definitions Y.

95.    The Pollution Policy provides coverage for "Covered Locations," which, among other locations, includes: (1) 2999-3001 Street Road, Bensalem, PA 19020 (Parx Casino and Parx Racing) (2)  700 Packer Avenue, Philadelphia, PA 19148 (South Philadelphia Race & Sportsbook, otherwise known as South Philadelphia Turf Club); and (3) 600 Cresson Boulevard, Oaks, PA 19331 (Oaks Race and Sportsbook, otherwise known as Valley Forge Turf Club).

96.    Like the Property Policies, the Pollution Policy contains multiple independent, yet overlapping, coverages for specific types of loss that might be suffered by Greenwood.  These separate coverages include the following, which are each potentially relevant to some or all of Greenwood's pandemic-related losses:

97.    **New Pollution Event – First Party Cleanup Costs**:  Zurich promised and agreed to pay "'cleanup costs' to the extent resulting from a 'new pollution event' that is on, at, under or that is migrating or has migrated beyond the boundaries from a 'covered location', if that 'new pollution event' is first 'discovered' during the 'policy period' and the 'discovery' is reported to us in writing during the 'policy period' or within ninety days following the end of the 'policy period'."  Exhibit C, at "Extended Reporting Period (Ninety Days)" Endorsement.

98.    **Suspension of Operations**:  Zurich promised and agreed to pay "'other loss' to the extent it results from a 'new pollution event' on, at, or under a 'covered location' for which

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

coverage for 'cleanup costs' is provided under this policy and if that 'new pollution event' directly causes a 'suspension of operations' at such 'covered location' during the 'policy period', provided the 'suspension of operations' is reported to us in writing during the 'policy period' or any applicable extended reporting period."  Exhibit C, at "Coverage D: Suspension of Operations – Loss of Business Income Including Evacuation Expense" Endorsement.

99.      The term "cleanup costs" is defined by Zurich to include both (i) costs and expenses incurred in the "investigation, removal, remediation (including associated monitoring), neutralization or immobilization of . . . contamination" that are "required by 'governmental authority'"; and (ii) "emergency expenses" which are defined as "costs, charges and expenses incurred to avoid an actual imminent and substantial endangerment to the public health." Exhibit C, at Section III, Definitions F.

100.      The term "new pollution event" is defined by Zurich to mean a "pollution event" that first commences during the policy period.  Exhibit C, at Section III, Definitions BB.

101.      The term "pollution event" is defined by Zurich as:

> the discharge, dispersal, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, vapor, soot, fumes, acids, alkalis, toxic or hazardous substances, electromagnetic fields, chemicals, waste (including medical, infectious and pathological waste), and low level radioactive waste and materials, into or upon land, or any structure on land, the atmosphere, or any watercourse or body of water including groundwater in concentrations or at levels in excess of those naturally present in the environment.  "Pollution event" includes:
>
> 1. The illicit abandonment of any irritant, contaminant or pollutants at a "covered location" provided that such abandonment was committed by parties other than the "insured" and without the knowledge of a "responsible insured"; and
>
> 2. Any "microbial substances" that are present on, at or within any buildings or other structures at a "covered location" or "job site".

Exhibit C, at "Amendatory Endorsement".

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

102.    The term "microbial substances" is defined by Zurich as "any substance that reproduces through release of spores or the splitting of cells including but not limited to bacteria (including legionella), viruses or mold whether or not the substance is living."  Exhibit C, at Section III, Definitions X.

103.    The term "other loss" is defined by Zurich as "'loss of business income', 'evacuation expense' and 'reasonable and necessary expenses', in excess of the Deductible, sustained by the 'named insured' during the 'period of indemnity'." Exhibit C, at "Coverage D: Suspension of Operations – Loss of Business Income Including Evacuation Expense" Endorsement.

104.    The term "suspension of operations" is defined by Zurich as "the necessary partial or complete suspension of 'operations' at the 'covered location' as a direct result of a 'cleanup' required by 'governmental authority'."  Exhibit C, at "Coverage D: Suspension of Operations – Loss of Business Income Including Evacuation Expense" Endorsement.

105.    The term "cleanup" is defined by Zurich as "those activities necessary to investigate, remove, remediate, neutralize or immobilize contaminated soil, surface water, groundwater, or other contamination to the extent required by 'governmental authority'." Exhibit C, at "Coverage D: Suspension of Operations – Loss of Business Income Including Evacuation Expense" Endorsement.

## THE INSURANCE INDUSTRY, AND ZURICH SPECIFICALLY, KNEW OF THE RISKS AND DANGERS OF THE PANDEMIC

106.    Insurance Companies, including Zurich, were repeatedly warned, and have been aware for years, of the potential impact of pandemics.  In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do – in the months and years before the current Coronavirus pandemic.  For example:

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

a.  One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community.  In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[3]

b.  The Insurance Library Association of Boston (founded 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early 2007 through 2018.[4]  The Association states on its website:  "The past 20 years has seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time.  We thought it might be apt for us to take a look back and see what the insurance industry has learned as well."  The webpage then lists various articles and reports discussing the risks and impacts of pandemics on the insurance industry.  For example, an article stated in 2014 that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, business interruption, travel and event cancellation and disability insurance."[5]

---

[3] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited January 27, 2021).

[4] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited January 27, 2021).

[5] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014).

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

107.    Moreover, over the course of decades, courts have held that the presence of a hazardous substance at or on a property, including the airspace inside buildings, constitutes property damage.

108.    Many courts have also held that the closure of property due to imminent risk of physical loss or damage or danger to inhabitants constitutes physical loss of property.

109.    Upon information and belief, insurers, including Zurich, have been and continue to be aware of these court decisions.

110.    In 2006, ISO considered the need to draft an exclusion that would bar coverage for losses caused by a virus, and in July 2006, ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to human disease causing viruses and bacteria.  In that circular, ISO cited "rotavirus, SARS, [and] influenza" and observed that "[t]he universe of disease-causing organisms is always in evolution."

111.    ISO's circular further recognized that "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property."

112.    With its circular ISO thus acknowledged that (i) the presence of a human disease causing virus could give rise to physical loss or damage to property; (ii) such damage could trigger coverage under property policies for property losses, including business interruption losses; and (iii) absent the addition of ISO's exclusion, the existing language in property policies, like that issued by Zurich here, did not *clearly* and *unambiguously* bar coverage for such virus-related or pandemic-related losses.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

113.     ISO therefore introduced with its circular a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).

114.     As noted in the circular, the purpose of this standard form language was to provide the entire insurance industry, including Zurich, with purportedly clear and unambiguous policy language to restrict or eliminate coverage for loss or damage resulting from infectious material and a pandemic.

115.     Accordingly, since 2006, the entire insurance industry has had the opportunity to incorporate, and many insurers have incorporated, ISO's standard virus exclusionary language into their policies in an effort to avoid covering loss due to a virus or other pathogen such as Coronavirus.

116.     Some insurers even went a step further and sought to bar coverage by including in certain of their policies express "pandemic" exclusions or other broad human disease-based exclusions.

117.     Conversely, those insurers that did not avail themselves of ISO's standard virus exclusionary language either explicitly accepted coverage for such losses or recklessly ignored the advice of the insurance industry's drafting organization.

118.     Here, Zurich chose not to include either the ISO-drafted virus exclusion or any other express pandemic or human-based disease exclusion in the Policies that they sold to Greenwood.

119.     In fact, by expressly providing coverage in the Property Policies for business interruption loss from a "Notifiable Disease," Zurich explicitly recognized that communicable

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

diseases cause physical loss or damage and that such loss might also be covered under another "provision in this Policy".

120.    In addition to this coverage for the "actual" presence of notifiable disease, the Property Policies also provides coverage for "all risks of" property loss from communicable disease, i.e., coverage for the ***threat*** to property caused by communicable disease (a "risk" covered "unless excluded").

121.    Under the Pollution Policy, Zurich specifically defined "pollution event" to include the presence of any "microbial substances," which is further defined to include "viruses."

122.    Moreover, while the Pollution Policy's base policy form excluded from the "pollution event" definition "any exposure to infected humans" or "contact with bodily fluids or materials of infected humans," this exclusionary language was expressly deleted by endorsement. *See* Exhibit C, at "Amendatory Endorsement" 1(F).

## THE CORONAVIRUS PANDEMIC

123.    In December 2019, the first instance of a respiratory illness caused by a novel coronavirus was identified in Wuhan, China.  In a matter of weeks, the virus quickly spread across Asia, the United States, and most of the world.

124.    In January 2020, the first reported case of Coronavirus was identified in the United States.

125.    On February 11, 2020, the International Committee on Taxonomy of Viruses named this novel coronavirus "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" (i.e., Coronavirus).  The same day, the World Health Organization ("WHO") named the disease caused by the Coronavirus, "COVID-19."

Case# 2021-01216-0 - JUDGE39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

126.    On March 11, 2020, the WHO declared the Coronavirus outbreak a worldwide pandemic[6] and noted its deep concern "by the alarming levels of spread and severity [of the Coronavirus]."

127.    According to numerous public health authorities, ***everyone*** is at risk of exposure to Coronavirus and falling ill with COVID-19 due to its highly contagious and easily transmitted nature.

128.    A single instance of Coronavirus in a community can (and as time has progressed, does) quickly and exponentially grow into a massive, uncontainable outbreak.

129.    Coronavirus is a highly contagious and easily transmitted human pathogen that is present in viral fluid particles in the air, as well as on surfaces (*e.g.*, walls, furniture, doors, fixtures, countertops and touch screens).  Through these particles, Coronavirus can be easily transmitted from person to person or from surface to person.

130.    According to the WHO and the Centers for Disease Control and Prevention ("CDC"), Coronavirus has several modes of transmission and can spread from person to person through physical droplets from the nose or mouth that are spread when an infected person sneezes, coughs or exhales.  The physical droplets then land on nearby objects and surfaces, where Coronavirus remains active and dangerous (even on inert objects and surfaces) for long periods of time.  People "catch" Coronavirus by being in the vicinity of a person who has Coronavirus and breathing in shed droplets, or by touching objects or surfaces on which droplets landed and then

---

[6] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited January 27, 2021).

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

touching their own eyes, nose, or mouth.  Those people then further spread Coronavirus throughout their environments and communities in the same manner.

131.    Coronavirus has spread widely in this manner in Pennsylvania, New Jersey, and nationwide, including through interactions with physical property inside premises and encounters with airborne particles within premises.

132.    Importantly, even asymptomatic infected persons (*i.e.*, those who have no sign of illness) can and do spread Coronavirus.[7]  In fact, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[8]

133.    According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[9]

134.    Similarly, *National Geographic* has reported that one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[10]

---

[7] *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited January 27, 2021).

[8] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last visited January 27, 2021).

[9] *See* Yuliya Pashina-Kottas, *et al.*, *This 3-D Simulation Shows Why Social Distancing Is So Important*, *The New York Times* (April 14, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited January 27, 2021).

[10] *See* Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited November 30, 2020).

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

135.    Based on such evidence, the WHO has reported that airborne transmission of Coronavirus may be possible in certain circumstances, and "is different from droplet transmission as it refers to the presence of microbes within droplet nuclei, which…[can] be transmitted to others over distances greater than 1 m."[11]

136.    Respiratory droplets expelled from infected individuals land on, attach, and adhere to surfaces and objects.  In doing so, they physically change the property and its surface by becoming a part of that surface.  As a result of this physical alteration, contact with those previously safe, inert surfaces (*e.g.,* walls, tables, countertops) has been made unsafe.

137.    Numerous scientific studies have documented that Coronavirus can physically remain on and alter property for extended periods of time.  For example:

    a.    A study documented in the *New England Journal of Medicine* found that Coronavirus is detectable in aerosols (*i.e.*, fine solid particles in air) for up to three hours, on copper for up to four hours, on cardboard up to 24 hours and on plastic or stainless steel for ***up to two to three days***.[12]

    b.    Another study found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for ***up to nine days***.[13]  Such surfaces, materials, and objects are

---

[11] *See* World Health Organization, *Modes of Transmission of Virus Causing COVID-19: Implications for IPC* (Mar. 29, 2020, updated on July 9, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (last visited November 30, 2020).

[12] *See* News Release, *New Coronavirus Stable for Hours on Surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), *available at* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited November 30, 2020).

[13] *See* G. Kampf *et al., Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation with Biocidal Agents*, J. HOSPITAL INFECTION (Feb. 6, 2020), *available at*

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

common in properties offering entertainment and dining to the public and include high-traffic items such as door knobs, countertops, and window treatments.

c.      A peer-reviewed article published in *Virology Journal* on October 7, 2020 found that Coronavirus can survive on surfaces for ***up to 28 days*** at ambient temperature and humidity (20 °C [68 °F] and 50% RH).[14]   The article concludes that Coronavirus "can remain infectious for significantly longer time periods than generally considered possible."

138.    Accordingly, because an individual with no symptoms can spread Coronavirus simply by breathing or talking, and because droplets containing Coronavirus can land and remain infectious on surfaces for many days, ***the risks*** posed by Coronavirus are not transient or short-term, but instead result in a fundamental altering of the environment, including both the physical surfaces of and the air within, a covered location until such time as that location is either sufficiently quarantined or disinfected.

139.    Moreover, even when the air and surfaces inside a building are thoroughly and effectively cleaned, each time an infected person enters that space the cycle renews such that infectious Coronavirus is likely (if not certain) to be present wherever people are located or congregate.

_____

https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (last visited January 27, 2021).

[14] *See* S. Riddell, *et al., The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited January 27, 2021).

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

140.    The world has seen communities shut down and reopen, only to be shut down again following another outbreak; the risk of spread wherever people are gathered (when indoors or in many instances, outdoors) is a near certainty without mitigation efforts.

141.    State and local governments and public health officials nationwide acknowledge that Coronavirus causes physical loss and damage to property.  For example:

    a.  The City of Philadelphia issued an Emergency Order that states "COVID-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain property and places."

    b.  The Secretary of the Pennsylvania Department of Health issued an Order Directing Building Safety Measures in part because "exposure is possible by touching a surface or object that has the virus on it and then touching one's nose, mouth or eyes."

    c.  The State of New Jersey issued an Order requiring closures of certain "brick-and-mortar facilities" and businesses in order to minimize "contact with common surfaces."

142.    This virtually guaranteed risk of significant harm and damage to persons and property is why it became necessary to limit or close the use of business spaces, such as Greenwood's properties.   It is also why in some instances closures and restrictions remain necessary today.

143.    This chain of events created both actual direct physical loss or damage to property at Greenwood's various premises, but, perhaps more importantly, a continuous threat of such direct physical loss or damage until significant mitigation efforts could be implemented.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

144.    Given the nature of Coronavirus, this cycle presented a continuous risk or threat of renewed property damage repeated with each individual infected with Coronavirus or carrying Coronavirus on their person that visited Greenwood's covered premises.

145.    Therefore, this actual and/or threatened presence of Coronavirus particles at Greenwood's premises rendered physical property within the premises damaged, unusable, uninhabitable, unfit for its intended function, dangerous, and unsafe.  In doing so, Coronavirus impaired and diminished the value, utility and normal function of the premises (including the physical property contained within).

146.    A Zurich company webpage admits the physical dangers associated with Coronavirus, advising customers to rely on the *New England Journal of Medicine*, the CDC, and other similar sources for advice as to how long the virus survives on surfaces and touch points.[15] The company underscored the need to repeatedly disinfect these surfaces, and to employ social distancing as an additional safety precaution.

147.    The Property Policies expressly insure against the "risk of" Greenwood's covered properties being rendered unusable, damaged, or unsafe from any non-excluded cause, including pandemic.

148.    The Pollution Policy also expressly insures losses, including loss of business income, arising from a "new pollution event" that results in the "suspension of operations."

---

[15] *See Facility & office disinfection during the COVID-19 crisis* (May 13, 2020), https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last visited November 30, 2020).

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## RESPONSES BY GREENWOOD AND GOVERNMENTAL
## PUBLIC HEALTH AUTHORITIES TO THE PANDEMIC

149.    On March 16, 2020, the CDC and the national Coronavirus Task Force issued guidance entitled "30 Days to Slow the Spread" of Coronavirus that called for extreme social distancing measures, such as working from home and avoiding gatherings of more than 10 people.

150.    On March 12, 2020, Pennsylvania Governor Tom Wolf issued a recommendation to cancel events of 250 or more individuals and to discourage travel to recreational facilities.[16]

151.    On March 14, 2020, Governor Wolf issued guidance for non-essential businesses to close[17] and a letter recommending certain businesses, including casinos, to cease operations.[18]

152.    On March 15, 2020, Governor Wolf issued an order requiring restaurants and bars to close dine-in service.[19]

153.    On March 16, 2020, Governor Tom Wolf issued further guidance encouraging non-essential businesses, expressly including casinos, to close.

---

[16] Press Release:  Gov. Wolf, Sec. of Health Outline COVID-19 Mitigation Guidance for Montgomery County, Commonwealth of Pennsylvania (March 12, 2020), Governor.pa.gov, https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-outline-covid-19-mitigation-guidance-for-montgomery-county-commonwealth-of-pennsylvania/ (last visited March 2, 2021).

[17] Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts (March 14, 2020), PA Dep't of Cmty. and Econ. Dev., https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/ (last visited March 2, 2021).

[18] Letter from Rachel L., Levine, MD, Sec'y of PA Dep't of Health, and Dennis M. Davin, Sec'y of PA Dep't of Cmty of Econ. Dev. to Business Owners, (March 14, 2020), PA Dep't of Cmty. and Econ. Dev., https://dced.pa.gov/download/letter-from-secretary levine/?wpdmdl=93426 (last visited March 2, 2021).

[19] Press Release:  Wolf Administration Orders Restaurants and Bars to Close Dine-In Service in Mitigation Counties Including Allegheny To Stop Spread of COVID-19 (March 15, 2020), Governor.pa.gov, https://www.governor.pa.gov/newsroom/wolf-administration-orders-restaurants-and-bars-to-close-dine-in-service-in-mitigation-counties-to-stop-spread-of-covid-19/ (last visited March 2, 2021).

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

154.    On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses to close.

155.    On March 23, 2020, Governor Wolf issued an order requiring individuals residing in certain Pennsylvania counties to stay at home, including in Bucks, Delaware, Montgomery, and Philadelphia Counties where Greenwood's properties are located.[20]

156.    Governor Wolf's orders related to Coronavirus have been extended and modified from time to time.

157.    On March 16, 2020, New Jersey Governor Phil Murphy ordered certain businesses including casinos, racetracks, and sports wagering facilities to close.[21]

158.    On March 21, 2020, Governor Murphy issued an order requiring all non-essential retail businesses in the state to close and individuals in the state to stay at home.[22]

159.    Governor Murphy's orders related to Coronavirus have been extended and modified from time to time.

160.    The Pennsylvania and New Jersey counties and localities in which Greenwood properties are located issued similar guidance and orders, which have been extended and modified from time to time.

---

[20] Press Release: Governor Wolf and Health Secretary Issue 'Stay at Home' Orders to 7 Counties to Mitigate Spread of COVID-19 (March 23, 2020), Governor.pa.gov, https://www.governor.pa.gov/newsroom/governor-wolf-and-health-secretary-issue-stay-at-home-orders-to-7-counties-to-mitigate-spread-of-covid-19/ (last visited March 2, 2021).

[21] See New Jersey Executive Order No. 104 (March 16, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf (last visited March 2, 2021).

[22] See New Jersey Executive Order No. 107 (March 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf (last visited March 2, 2021).

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

161.     Commencing in March 2020, Greenwood was required to suspend operations at its covered premises as a result of the risks associated with the Coronavirus pandemic, including physical loss of or damage to covered property, and in compliance with government guidance and orders.   Greenwood was also required to incur costs to prevent, cleanup, and remediate the presence of Coronavirus to avoid and redress the imminent, substantial danger to public health. Such costs were further incurred at the direction of government authorities.

162.     On March 13, 2020, Greenwood closed Oaks Race & Sportsbook.

163.     On March 13, 2020, Greenwood closed Parx Racetrack.

164.     On March 15, 2020, Greenwood closed Parx Casino, South Philadelphia Race & Sportsbook, and Favorites at Egg Harbor Township.

165.     The closure of Greenwood's properties resulted in immediate property loss and damage, including but not limited to the loss of and damage to perishable property.

166.     A minimal number of employees worked onsite at Parx Racing and Parx Casino to perform cleaning and disinfecting of the premises, as well as security services, but Greenwood otherwise suspended its business operations at all premises and derived no revenue from on-site operations.

167.     Greenwood incurred substantial costs, including, but not limited to, performing additional cleaning and sanitization; purchasing additional cleaning supplies; purchasing personal protection equipment (PPE); and for construction and reorganization at its premises.

168.     In addition, despite the substantial losses incurred to guard against the risks of Coronavirus, including closures of its properties, actual incidents of COVID-19 were detected at certain covered locations.   For example, from time to time, employees from certain covered locations have tested positive for COVID-19.   As a result of this risk, Greenwood has incurred

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

extensive additional costs to cleanup, remove, and remediate the actual and/or potential presence of Coronavirus.

169.    As Greenwood specifically advised Zurich, Greenwood communicated with governmental authorities regarding the presence of Coronavirus and the closing of operations, including at least the Pennsylvania Gaming Control Board, the Pennsylvania State Horse Racing Commission, the New Jersey Division of Gaming Enforcement, and the Bucks County Health Department.

170.    The covered properties had the following dates of reopening:

a.    Parx Casino reopened to the public on June 29, 2020, but then was closed again from December 12, 2020, through January 3, 2021;

b.    Parx Racing reopened to the public on July 6, 2020, but then was closed again from December 12, 2020, through January 3, 2021;

c.    South Philadelphia Race & Sportsbook reopened to the public on August 24, 2020, but then was closed again from November 20, 2020, through January 7, 2021;

d.    Oaks Race & Sportsbook never reopened to the public after it was decided on or about June 29, 2020, to close the facility permanently; and

e.    Favorites at Egg Harbor Township reopened to the public on September 1, 2020.

171.    At present, Greenwood continues to suffer loss at its covered properties due to the risks of Coronavirus and the continuing pandemic by, among other things, its necessary compliance with governmental capacity and social distancing directives.    Greenwood also

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

continues to incur substantial costs to prevent the spread of Coronavirus among its staff and patrons.

## THE IMPACT OF CORONAVIRUS

172.    The impact of the Coronavirus pandemic has been massive and devastating to people, businesses, and local governments.

173.    As of March 1, 2021, Coronavirus has been detected in nearly every country, with total reported cases greater than 114 million and more than 2.5 million people having died.  In the United States alone, more than 28 million people have tested positive for COVID-19, with more than 500,000 people having died of the disease or related causes.

174.    Various governments' attempts at phased re-openings in the summer and fall of 2020 did not help matters.  As some visitors cautiously returned to patronize businesses, so did Coronavirus, leading many jurisdictions, including Pennsylvania and New Jersey, to reimpose restrictions on businesses to combat the latest surge.

175.    For these reasons, it is virtually certain that, without mitigation efforts, the Coronavirus presents a continued risk of physical loss of or damage to Greenwood's covered premises.  Each time an infected person enters a place of business, without mitigation efforts, so do the risks associated with Coronavirus.

176.    Indeed, if Greenwood had conducted business as usual, the disease and virus spread would have been inevitably much worse than it has been, resulting in an even greater impact on persons and property.  Under these circumstances, Greenwood's properties could not be used according to their intended functions during their forced closure and, even after reopening, have been restricted in their operations.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania. Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**THE PROPERTY POLICIES APPLY TO
GREENWOOD'S CORONAVIRUS LOSSES**

177.    The risk of spread of Coronavirus causes direct physical loss of or damage to property, and the Property Policies include no enforceable exclusion that would preclude coverage for such risks of loss or damage to covered property.

178.    Coverage is not limited, as Zurich contends, to the Notifiable Disease Endorsement.

179.    In providing coverage for "notifiable disease," Zurich recognizes that the actual presence of a "human infectious or human contagious disease" (as the term "notifiable disease" is defined) necessarily triggers the Insuring Agreement set forth in each the Property Policies, which provides coverage for "direct physical loss" of property.

180.    This interpretation is further bolstered by a number of other provisions of the Property Policies that also explicitly recognize that a risk of contamination or other loss from particles located in the air or not visible to the eye nonetheless constitutes "direct physical loss of or damage" to property even when such particles do not cause physical alteration to structures.

181.    Specifically, the Property Policies contain:

    a)    sublimits for ammonia contamination resulting from a Breakdown of Covered Equipment at a Scheduled Location;

    b)    sublimits for radioactive contamination; and

    c)    sublimits for certain "Decontamination Costs" where a property is Contaminated and there is a law or ordinance regulating the Contamination due to the "actual" presence of Contaminant(s).

    d)    provisions excluding "smoke, vapor, … [and] fumes" as "Contaminant(s)"

182.    For example, the inclusion of so-called "Contamination" exclusions in the Property Policies purporting to bar coverage due to the presence of substances which do not cause physical

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

alteration of structures, such as "smoke" "vapor" and "fumes," demonstrates Zurich's acknowledgment that such substances can and do cause covered physical loss of property, absent an express exclusion.

183.    Zurich defined the terms "Contaminated" and "Contamination" by endorsement to mean: "Any condition of property due to the actual presence of any Contaminant(s)."  Exhibits A & B, at "Amendatory Endorsement – Louisiana" ¶ 11.

184.    Zurich defined the term "Contaminant(s)" by endorsement to mean:  "Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, Fungus or Spores." *Id.* ¶ 12.

185.    Over thirty courts nationwide have already concluded that insureds have properly alleged or are in fact entitled to coverage under similar policy terms and in similar factual circumstances to those suffered by the Greenwood here.

186.    Upon information and belief, Zurich is aware of these court decisions, and because numerous courts agree that Coronavirus may cause "physical loss or damage to" property, Greenwood's belief that the Property Policies provides coverage is at least reasonable, notwithstanding Zurich's statement to the contrary.

187.    Accordingly, the 2019-2020 Property Policy's "Property Damage" coverage applies by its terms, triggering Zurich's obligation to pay up to that policy's $850,000,000 limit of liability.

188.    Moreover, the 2020-2021 Property Policy's "Property Damage" coverage also applies by its terms, triggering Zurich's obligation to pay up to that policy's $1,000,000,000 limit of liability.

189.   Greenwood suffered a direct, physical loss of or damage to its real and personal property when it among other things lost the physical use of its property and suffered physical damage to the property located therein, including to its perishable property.

190.   The 2019-2020 Property Policy's "Time Element" coverage also applies by its terms, triggering Zurich's obligation to pay up to that policy's $850,000,000 limit of liability.

191.   Moreover, the 2020-2021 Property Policy's "Time Element" coverage also applies by its terms, triggering Zurich's obligation to pay up to that policy's $1,000,000,000 limit of liability.

192.   Greenwood suffered, and continues to suffer, a necessary "suspension" of operations, as that term is defined by the Policies, as a result of the above-referenced direct physical loss of and damage to its property.

193.   The Property Policies' respective "Extra Expense" coverages also apply by their terms, triggering Zurich's obligation to pay up to those policies' separate and independent $50,000,000 sublimits of liability.

194.   Greenwood has incurred and will continue incurring expenses over and above the expenses it would have normally incurred had there been no direct physical loss or damage to its covered property.

195.   The Property Policies' respective "Civil or Military Authority" coverages also apply by their terms, triggering Zurich's obligation to pay up to those policies' separate and independent $10,000,000 sublimits of liability.

196.   Greenwood suffered a necessary "suspension" of operations caused by orders of civil authority that prohibited access to the casino, racetrack, and other properties.  Such orders resulted from the civil authority's response to the Coronavirus pandemic and its concomitant direct

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

physical loss of or damage to properties located within 1 mile of the casino, racetrack, and other properties.

197.    The Property Policies' respective "Ingress/Egress" coverages apply by their terms, triggering Zurich's obligation to pay up to those policies' separate and independent $10,000,000 sublimits of liability.

198.    Greenwood suffered a necessary "suspension" of its operations because its customers were prevented by physical obstruction from ingress or egress to Greenwood's casinos and racetracks due to direct physical loss of or damage to other properties located within 1 mile of Greenwood's properties.

199.    The term "prevented" is not defined by the Policies.   Dictionary definitions of "prevent" include:

a.      "[T]o keep from occurring; avert; hinder."     Prevent, Dictionary.com, https://www.dictionary.com/browse/prevent?s=t

b.      "To keep from happening; avert" and "impede."   Prevent, The Free Dictionary, https://www.thefreedictionary.com/prevent

c.      "[T]o to keep from happening or existing."     Prevent, Merriam-Webster, https://www.merriam-webster.com/dictionary/prevent

200.    At minimum, Greenwood's customers, suppliers, and employees were "hindered," "impeded," or "kept from" patronizing or visiting Greenwood's covered properties as a result of the physical closure of those locations' doors.

**THE POLLUTION POLICY APPLIES TO
GREENWOOD'S CORONAVIRUS LOSSES**

201.    Coverage for a "New Pollution Event" and "First Party Cleanup Costs" applies by those provisions' terms.

39

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

202.   Given the prevalence of Coronavirus in the communities where Greenwood's covered properties are located and the positive test results of certain of Greenwood's employees, it is a virtual certainty that from time to time the Coronavirus was located on Greenwood's properties during the term of the Pollution Policy.

203.   As a result of certain employees' positive test results and at the direction of government authorities, Greenwood incurred "cleanup costs" to remove Coronavirus contamination as well as emergency expenses to avoid an actual imminent and substantial endangerment to the public health.

204.   Therefore, to the extent Zurich contends that Greenwood did not incur "cleanup costs" because the costs to remove Coronavirus contamination were not required by a governmental authority, Zurich is factually incorrect.

205.   In addition, the Pollution Policy's "cleanup costs" definition is not limited to costs required by a governmental authority because Zurich defined "cleanup costs" to also include "emergency expenses" to avoid an actual imminent and substantial endangerment to the public health, which Greenwood certainly incurred here.

206.   To the extent Zurich contends that there was no "pollution event" at Greenwood's properties, Zurich is likewise factually and legally incorrect.

207.   The Pollution Policy's "pollution event" definition as drafted by Zurich includes the presence at a covered location of "microbial substances."   *See* Exhibit C, at "Amendatory Endorsement" 1(F).

208.   The Pollution Policy's "microbial substances" definition as drafted by Zurich includes "any substance that reproduces through release of spores or the splitting of cells including

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

but not limited to bacteria (including legionella), *viruses* or mold whether or not the substance is living" (emphasis added).  Exhibit C, at Section III, Definitions X.

209.   As explained above, each time an employee or patron infected with Coronavirus entered or enters one of Greenwood's properties, the virus would have contaminated that location until Greenwood's sanitation and other risk mitigation efforts removed the virus.

210.   Given the nature of Coronavirus, this cycle constitutes a "new pollution event" because Coronavirus was likely (if not certain) to be present wherever people are located or congregate.

211.   In response to this "new pollution event," governmental authorities ordered that Greenwood suspend its operations at its various "covered locations" as a way of protecting the public health from this cycle of person to person and surface to person infection.

212.   In doing so, those governmental authorities were seeking to remove, remediate, neutralize, and immobilize the Coronavirus from the covered locations and protect healthy, uninfected members of the public.  As such, Greenwood was ordered to perform a "cleanup," as that term is defined by Zurich in the Pollution Policy, at its covered locations.

213.   As a result, Greenwood's closure of its covered locations constituted a "suspension of operations," which Zurich defines in the Pollution Policy as a "suspension of 'operations' at the 'covered locations' as a direct result of a 'cleanup' required by 'governmental authority'."

214.   Accordingly, the Pollution Policy's coverage for "Suspension of Operations" applies by its terms, triggering Zurich's obligation to pay up to the Pollution Policy's $15,000,000 limit of liability.

### THERE IS NO ENFORCEABLE EXCLUSION
### APPLICABLE TO GREENWOOD'S LOSSES

215.   A pandemic, such as Coronavirus, is not excluded by either of the Policies.

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

216.    Had Zurich wished to exclude pandemic from the Policies, it could have incorporated into one or both of the Policies either a specific exclusion (such as a pandemic or other similar broad and express exclusion) or the ISO virus or bacteria exclusion referenced in ¶ 113, *supra*.

217.    Zurich did not incorporate any such exclusion in any of the Policies at issue here.

218.    Upon information and belief, Zurich was aware of the risk or threat of an infectious disease pandemic due to SARS and avian flu prior to issuing the Policies to Greenwood.

219.    Yet, Zurich knowingly issued the Policies without the ISO virus or bacteria exclusion.

220.    Now, after being presented with Greenwood's claim, Zurich is attempting to avoid coverage for an infectious disease pandemic, such as the present Coronavirus pandemic, without having included widely available policy language that was specifically designed to protect Zurich from such potential exposure.

221.    In denying coverage under the Pollution Policy, Zurich has not cited any potentially applicable policy exclusions, and no such potentially applicable policy exclusions are set forth in the Pollution Policy.

222.    In denying coverage under the Property Policies, Zurich wrongly contended that the Property Policies' "Contamination" exclusion applied to limit or bar coverage.

223.    The Property Policies' "Contamination" exclusion states, in relevant part:

> This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy.
>
> **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

Exhibits A & B, Section III ¶ 3.03 – 3.03.01.01.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

224.    In the base policy form, Zurich defined "Contamination" to include the actual presence of "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew."  Exhibits A & B, Section VII ¶ 7.09.

225.    But, through an endorsement, Zurich narrowed the scope of the "Contamination" exclusion by redefining the term "Contamination" to delete any reference to pathogen or pathogenic organism, bacteria, virus, and disease-causing illness or agent.  Exhibits A & B, at "Amendatory Endorsement – Louisiana" ¶ 11.

226.    The drafting history of this "Louisiana Endorsement" reveals that the purpose of the revisions to the "Contamination" and "Contaminants" definitions was to clarify and render the Property Policies' "Contamination" exclusions consistent with the expectations of a reasonable insured.

227.    Specifically, when Zurich submitted a revised version of the EDGE™ form to the Louisiana Insurance Department ("Department") for approval in 2011, the Department objected to the "Contamination" exclusion.

228.    In a contemporaneous Explanatory Memorandum, a true and correct copy of which is attached hereto as Exhibit D, the Department objected to Zurich's standard "Contamination" definition, explaining that the inclusion of "pathogens . . . bacteria and virus" impermissibly expanded the scope of the "Contamination" exclusion beyond the reasonable expectations of policyholders.  *See* Exhibit D at 13 ("This Department views pollutants as substances that damage the natural environment when accidentally spilled, leaked, or discharged.  Hence, the presence of products such as ... mold, mildew, and bacteria and ***virus that lead to disease or health hazards*** do not fit our definition of pollutants and ***should not be included in the text of a pollution exclusion or referred to as examples of pollutants***.") (emphasis added).

Case# 2021-01216-0 - JUDGE.39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

229.    The Explanatory Memorandum further noted that if Zurich wished to exclude losses resulting from health hazards, it should create separate exclusions for such losses:

> ***Damages relating to these types of products and health hazards MAY be excluded from coverage, but they should not be included within a pollution exclusion.  It is recommended to create separate exclusions and definitions for*** contaminants such as fungus, mold, asbestos, spores, bacteria, virus, biological substances, medical waste ***and products that may lead to disease***.

Exhibit D at 13 (emphases added).

230.    The Louisiana Endorsement also modified the "Contamination" exclusory provisions to rectify poor draftsmanship by, among other things, modifying the definition of "Contamination" incorporate the "Contaminant(s)" definition:

11. The following is deleted from SECTION VII - DEFINITIONS

> **Contamination(Contaminated)** - Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew.

and replaced by the following:

> **Contamination(Contaminated)** - Any condition of property due to the actual presence of any **Contaminant(s)**.

12. The following is deleted from SECTION VII – DEFINITIONS:

> **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**.

And replaced with the following:

> **Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**.

Exhibits A & B, at "Amendatory Endorsement – Louisiana" ¶¶ 11–12.

231.    Though it bears a title of "Amendatory Endorsement – Louisiana," the Louisiana Endorsement expressly states that it modifies the entire policy:  "**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**" *Id.* (Top line).

232.    This is in stark contrast to the language used in the New York and Connecticut state-specific endorsements set forth in the Property Policies that explicitly limit those

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

endorsements' effects to risks located in those respective jurisdictions. *See* Exhibits A & B, at "Amendatory Endorsement – New York" ("**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK**"); *id.* at "Amendatory Endorsement – Connecticut" ("**THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT**").

233.    Moreover, on August 31, 2020, during the near-peak of the pandemic, Zurich sought to incorporate similar state-limiting language into the Louisiana Endorsement, notably *after* it sold Greenwood the 2020-2021 Property Policy and *after* Greenwood and countless similarly situated policyholders had asserted claims for coverage for their pandemic-related losses.  A true and correct copy of Zurich's August 31, 2020 proposed changes to the Louisiana Endorsement is attached hereto as Exhibit E.

234.    Furthermore, the name of the Louisiana Endorsement has no bearing on coverage, as Section 6.20 of the Property Policies explicitly states:  "The titles of the various paragraphs and endorsements are solely for reference and shall not in any way affect the provisions to which they relate."  Exhibits A & B, at Section VI ¶ 6.20.

235.    In sum, the Louisiana Endorsement's deletion of any reference to "pathogen or pathogenic organism, bacteria, virus, and disease-causing illness or agent" from the definition of "Contamination" confirms that the so-called "Contamination exclusion" cannot bar coverage for losses due to COVID-19.

236.    The Property Policies' "Contamination" exclusion also, on its face, expressly applies solely to "costs" and makes no mention of "losses."  Greenwood has suffered substantial "losses" as that term is used in the Property Policies regardless of any incurred "costs."

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

237.    Finally, the "Contamination" exclusion fails to apply to Greenwood's pandemic-related losses because Property Policies' "Contamination" definition is limited to the "actual presence" of Contaminant(s), unlike similar exclusions issued by other property insurers which extend to the "actual, alleged or threatened release, discharge, escape or disposal" of Contaminant(s).

238.    Critically, despite the lack of an exclusion barring coverage for viruses or pandemics in the 2019-2020 Property Policy, Zurich elected to issue the 2020-2021 Property Policy on April 1, 2020 on the same basic policy form and without any new exclusions or modifications designed to limit coverage for pandemic-related losses.

239.    This was not true for the renewal of the Pollution Policy that Zurich sold to Greenwood for the period of 2020-2023, which notes that, under the new policy, "'pollution event'" does not include any exposure to infected humans or animals, or contact with bodily fluids or materials of infected humans or animals."

240.    Zurich thus made a conscious choice in seeking to preclude coverage for the Coronavirus pandemic in its renewal of the Pollution Policy, but ***not*** in the 2020-2021 Property Policy.

241.    Thus, for multiple reasons, the "Contamination" exclusion does not extend to Greenwood's pandemic-related coverage claims.

242.    At best for Zurich, the Property Policies' Contamination exclusion is ambiguous and must be construed in Greenwood's favor.

## ZURICH'S DENIAL OF COVERAGE UNDER THE PROPERTY INSURANCE POLICIES

243.    Greenwood timely reported a claim to Zurich under the 2019-2020 Property Policy on March 18, 2020.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

244.     Greenwood timely reported a second and independent claim to Zurich under the 2020-2021 Property Policy on December 18, 2020, related to the subsequent and unrelated closure of nearly all of Greenwood's properties during the winter of 2020-2021.

245.     On April 2, 2020, the adjuster for Zurich asked specific questions in order to investigate Greenwood's claim, to which Greenwood responded in detail on April 9, 2020.

246.     On May 12, 2020, Zurich issued a letter reserving its rights to deny coverage but requested no further information to complete its investigation.

247.     Nevertheless, on June 1, 2020, Greenwood supplemented its April 9, 2020 response to Zurich's questionnaire.

248.     On or about July 6, 2020, Greenwood was advised that Zurich retained a forensic accountant, Matson Driscoll & Damico LLP ("MDD"), to assist in adjusting and calculating Greenwood's covered loss.

249.     On July 15, 2020, MDD requested documents from Greenwood.

250.     On July 24, 2020, after continuing to incur substantial losses from its business closures, Greenwood sent a letter to Zurich requesting a good faith, interim payment of $5,000,000 representing the limit of liability under the Notifiable Disease Endorsement.

251.     Given that Greenwood's losses had already exceeded $5,000,000 by that time, Greenwood requested the interim payment without waiving its rights to other coverages under the 2019-2020 Property Policy.

252.     On September 1, 2020, Greenwood sent additional financial information to MDD regarding its operating losses at each of its covered facilities.

253.     Following additional communications over the next months, Zurich issued a check to Greenwood in the amount of $5,000,000 on November 24, 2020.

47

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

254.   On the check, Zurich added a notation stating: "Full & Final Payment on notifiable disease coverage."

255.   In numerous subsequent communications, Greenwood sought Zurich's agreement that Greenwood's acceptance of the interim payment would not impact the remaining involved aspects of Greenwood's pending claim under the 2019-2020 Property Policy.

256.   Finally, in an undated letter received on February 18, 2020, Zurich informed Greenwood that its $5,000,000 payment was "an unconditional payment, and [Zurich] agrees that Greenwood's acceptance of the [$5,000,000] Payment is not a waiver of Greenwood's Original Claim under other provisions of the 2019-20 Policy."

257.   Nevertheless, in the same letter received on February 18, 2020, Zurich wrongly denied coverage to Greenwood under all of the provisions of the 2019-2020 Property Policy, except for the Notifiable Disease Endorsement, and all of the provisions of the 2020-2021 Property Policy, including the Notifiable Disease Endorsement.

258.   Accordingly, despite numerous requests from Greenwood, Zurich has refused to honor its full coverage obligations with respect to the triggered coverages under the Property Policies, except for the Notifiable Disease Endorsement under the 2019-2020 Property Policy.

259.   Zurich's denial was premised on a knowing or reckless misrepresentation of fact that "[t]he presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property" and that the multiple closures of Greenwood's properties related to the same "occurrence" even though they occurred under separate policy periods.

260.   Indeed, Zurich's own webpage states that (i) Coronavirus spreads when someone touches a "contaminated surface" and then touches their nose or mouth; (ii) a study in the New England Journal of Medicine shows "coronavirus particles can remain suspended in the air

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

for up to three hours" and "can also live on various surfaces for up to 72 hours"; and (iii) "given the length of time the coronavirus can linger on certain surfaces," the CDC recommends frequent cleaning of doorknobs, elevator buttons, light switches, faucet handles, computers, countertops, tables, and other surfaces.[23]  All of this equipment is used at Greenwood's casino, racetrack, and other properties.

261.    In addition, Zurich has misrepresented the scope of the Property Policies by, *inter alia,* stating that certain policy exclusions apply, such as a "Contamination" exclusion, when such exclusions are inapplicable, ambiguous, and/or unenforceable.

262.    Greenwood has complied with all terms and conditions contained in the Property Policies except to the extent its performance has been or is excused or waived by Zurich.

## ZURICH'S DENIAL OF COVERAGE UNDER THE POLLUTION INSURANCE POLICY

263.    Greenwood timely reported a claim under the Pollution Policy to Zurich on March 18, 2020.

264.    On April 20, 2020, Zurich issued a letter reserving rights to deny coverage and asked specific questions in order to complete its investigation and issue a coverage determination.

265.    On May 6, 2020, Greenwood responded in detail to Zurich's questionnaire.

266.    On June 8, 2020, Zurich's adjuster asked additional questions for its investigation, to which Greenwood responded in detail on June 16, 2020.

267.    Six days later, on June 22, 2020, Zurich issued a letter wrongly denying coverage in full under the Pollution Policy.

---

[23] *See Facility & office disinfection during the COVID-19 crisis* (May 13, 2020), https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last visited February 5, 2021).

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

268.   The positions Zurich has taken in its correspondence to Greenwood make clear that it has no intention of covering Greenwood's claims and that any claimed investigation of Greenwood's claims was perfunctory and mere pretext.  Thus, court adjudication is necessary to resolve the parties' disagreements as to the scope of insurance coverage for Greenwood's losses.

269.   Zurich has misrepresented the scope of the Pollution Policy by, *inter alia,* wrongly stating that the governmental enforced closure of Greenwood's covered properties was not a "suspension of operations" and no "new pollution event" occurred as a result of the Coronavirus pandemic.

270.   As explained above, Zurich's wrongful coverage determination under the Pollution Policy is belied by the Pollution Policy's explicit terms and conditions and the facts of Greenwood's coverage claim.

271.   Greenwood has complied with all terms and conditions contained in the Pollution Policy except to the extent its performance has been or is excused or waived by Zurich.

## COUNT I
## DECLARATORY JUDGMENT

272.   Greenwood realleges and incorporates by reference all preceding allegations as if fully stated herein.

273.   Greenwood seeks a declaration by this Court of the rights of Greenwood and the obligations of Zurich under the Policies, which are contractual agreements to provide insurance coverage for Greenwood's losses, including its pandemic-related losses.

274.   Greenwood contends that each of the Policies obligate Zurich to pay for Greenwood's pandemic-related losses under multiple, independent coverages which together provide full coverage for Greenwood's losses.

275.   Zurich disputes Greenwood's contentions.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

276.   Zurich contends that coverage under the Property Policies is limited to that provided by the Notifiable Disease Endorsement, and that the Pollution Policy provides no coverage for Greenwood's losses because neither a "new pollution event" nor a "suspension of operations" has allegedly occurred.

277.   Greenwood contends that Zurich's coverage analysis to date is contrary to the Policies, the law, and public policy.

278.   Greenwood contends that the Policies must be interpreted in a reasonable manner to provide the coverage that the parties intended and understood was being provided, and that is in accord with Greenwood's reasonable expectations.

279.   Greenwood is informed and believes, and on that basis alleges, that Zurich disputes its contentions.

280.   An actual and justiciable controversy therefore exists between Greenwood and Zurich concerning the matters alleged herein.

281.   Greenwood seeks a judicial declaration confirming:

(i)   that Zurich's contentions as stated above are wrong, and that Greenwood's contentions as stated above are correct; that Zurich must honor all duties under its Policies, including its duty to pay for the full amount of covered losses that have accrued and are continuing to be accrued as a result of the risks of the Coronavirus pandemic;

(ii)   that Greenwood's pandemic-related losses, including losses that accrue after the filing of this action, as well as the facts and circumstances attendant thereto, trigger coverage up to the applicable policy limits or sublimits, if applicable, under at least the Property Policies' independent coverages for

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(1) "Property Damage"; (2) "Time Element"; (3) "Extra Expense"; (4) "Civil or Military Authority"; and (5) "Ingress/Egress", and that such the availability of coverages is not limited to the scope of the "Notifiable Disease Endorsement"; and

(iii)    that Greenwood's pandemic-related losses, including losses that accrue after the filing of this action, as well as the facts and circumstances attendant thereto, trigger coverage up to the applicable policy limits for under at least the Pollution Policy's independent coverages for (1) "First Party Cleanup Costs" and (2) "Suspension of Operations"; and

(iv)    that Zurich's denial of coverage under the Policies violates Pennsylvania public policy.

282.    Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Greenwood prays for judgment as follows:

a.    Judgment in favor of Greenwood and against Zurich on all claims;

b.    Declaratory Judgment as set forth in Count I above;

c.    Attorneys' fees and costs; and

d.    Such other and further relief as the Court deems proper.

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Dated:  March 8, 2021

Respectfully submitted,


BLANK ROME LLP


By:

/s/ Michael A. Iannucci

MICHAEL A. IANNUCCI
(Pa. ID. No. 206169)
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500
Fax: (215) 569-5555
Email: Iannucci@BlankRome.com

JUSTIN F. LAVELLA
(*pro hac vice* forthcoming)
1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 420-2200
Fax: (202) 420-2201
Email: JLavella@BlankRome.com


*Attorneys for Plaintiffs Greenwood Racing Inc., Greenwood Gaming and Entertainment, Inc., Racetrack Op Co., City Turf Club Op Co., Turf Club Op Co., and ACRA Turf Club, LLC.*

# **VERIFICATION**

I, Robert B. Mulhern, Jr., Esquire, state that I am Assistant General Counsel of Greenwood Racing Inc. and its subsidiaries and affiliates; that as such, I am authorized to take this Verification; that the foregoing Complaint was prepared with the assistance of others within the company and with the advice of counsel; and that the facts set forth therein are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities

DATE: _3/8/2021_                    _Robert B. Mulhern Jr._
                                        Robert B. Mulhern, Jr.
                                        Assistant General Counsel

Case# 2021-01216-0 - JUDGE:39 Received at County of Bucks Prothonotary on 03/08/2021 7:46 PM, Fee = $258.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.