IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GREENWOOD RACING INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN GUARANTEE & LIABILITY INSURANCE CO. and STEADFAST INSURANCE CO., <br><br> *Defendants*. | CIVIL ACTION <br> NO. 21-1682 |

**PAPPERT, J.**                                                                                        November 1, 2021

**<u>MEMORANDUM</u>**

Greenwood and its subsidiaries (collectively "Greenwood") sued its insurance carriers, American Guarantee and Liability Insurance Company and Steadfast Insurance Company, seeking a declaration that the losses it sustained as a result of the coronavirus pandemic were covered by its insurance policies. Steadfast, which issued Greenwood an environmental liability insurance policy that expired on April 1, 2020, moves to dismiss Greenwood's claims against it. The Court grants the Motion and dismisses the claims without prejudice.

I

Greenwood owns and operates a casino, racetrack and other gambling facilities in Pennsylvania and New Jersey. (Compl. ¶ 1, ECF No. 1-3.) In mid-March of 2020, the COVID-19 pandemic and subsequent government actions brought these businesses to a sudden halt. (*Id.* ¶¶ 161–64, 170.) Pennsylvania Governor Tom Wolf encouraged non-essential businesses to close on March 14, 2020, then ordered them to do so on March 19. (*Id.* ¶¶ 151, 154). Two of Greenwood's facilities, Parx Racing and Oaks Race

1

& Sports Book, closed on March 13.  (*Id.* ¶¶ 33, 35.)  Its two other Pennsylvania locations, Parx Casino and South Philadelphia Race & Sportsbook, closed on March 15.  (*Id.* ¶¶ 32–34.)  All of these locations remained closed for several months.  (*Id.* ¶¶ 32–35.)  Oaks Race & Sportsbook never reopened.  (*Id.* ¶ 35.)

Greenwood suffered tremendous losses as a result of the shutdowns.  (*Id.* ¶ 168.)  It also incurred substantial costs to reduce the risk of coronavirus at its facilities.  (*Id.* ¶ 167.)  It increased its cleaning regimen, purchased additional protective equipment and cleaning supplies, and spent money reorganizing its premises to make them safer.  (*Id.*)  Despite the closure of its properties and the additional steps taken to prevent the spread of coronavirus, some employees tested positive.  (*Id.* ¶ 168.)

Between April 1, 2017 and April 1, 2020, Greenwood's Pennsylvania locations were insured in part under an environmental liability policy issued by Steadfast.  (*Id.* ¶¶ 92, 95; Z Choice Real Estate Environmental Liability Declarations, ECF No. 1-4 at 409.)[1]  Among other things, the policy covered "cleanup costs" that result from a "new pollution event" at or emanating from a covered location, if the event is discovered during the policy period and reported to Steadfast within ninety days of the end of the policy.  (Compl. ¶ 97; Extended Reporting Period § I.B.1, at 444.)  The policy covered two types of cleanup costs, "emergency expenses" and costs and expenses incurred in the "investigation, removal, remediation . . . neutralization or immobilization of . . . contamination" to the extent these activities were required by "governmental authority."  (Compl. ¶ 99; Amendatory Endorsement § III.F.1–3, at 455.)

---

[1]   The page numbers provided in citations to Greenwood's environmental liability policy all refer to their page number in Exhibit B – State Court Filings, ECF No. 1-4.

The policy also included a "suspension of operations" endorsement that covered "other loss" caused by a suspension of operations at a covered location, subject to several conditions: (1) the suspension must be caused by a new pollution event, (2) it must be an event for which cleanup costs coverage is provided, (3) the suspension must be the direct result of a government-mandated cleanup and (4) the suspension must be reported to Steadfast within ninety days of the end of the policy. (Compl. ¶¶ 98, 104; Coverage D: Suspension of Operations §§ I.D.2, II, at 448–450.) "Other loss" included loss of business income. (Compl. ¶ 103.)

Greenwood claims that it incurred both extra expenses and government mandated cleanup costs as a result of the coronavirus pandemic, the actual presence of coronavirus at its covered locations, and various government orders. (*Id.* ¶¶ 202–03, 212.) It also contends that its coronavirus-related losses are covered by the suspension of operations endorsement. (*Id.* ¶¶ 213–14.) Steadfast disagrees, and on June 22, 2020, it denied Greenwood coverage. (*Id.* ¶ 267.)

Greenwood then filed suit in Pennsylvania state court, seeking a declaration that its losses were covered by a number of insurance policies, including the environmental liability policy issued by Steadfast. (*Id.* ¶ 281.) Steadfast and its codefendant removed the case, (ECF No. 1), and Steadfast moved to dismiss the claims against it, (ECF No. 12).

II

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pleaded "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).  However, this "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face."  *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted).  "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption."  *Id.*

In deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  A district court ruling on a Rule 12(b)(6) motion generally may not consider matters extraneous to the pleadings, though an exception exists if the "document [is] *integral to or explicitly relied* upon in the complaint."  *Id.* at 249 (emphasis in original) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *see also Schuchardt*, 839 F.3d at 353 (same).

III

Under Pennsylvania law, insurance policies are contracts between insurer and policy holder. *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). Their proper interpretation is a question of law for the court to decide. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). In doing so, courts must "effectuate the intent of the contracting parties as reflected by the written language of the insurance policies." *Kurach*, 235 A.3d at 1116. Where the terms of the policy are unambiguous, courts will give them their plain and ordinary meaning, unless doing so would violate clearly established public policy. *Id.* Where they are ambiguous, they must be construed in favor of the policyholder. *Id.*

Language in a policy is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* A word is not ambiguous, however, simply because it is undefined. *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 849 (Pa. Super. Ct. 2020). Instead, "words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense," *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999), and courts may look to dictionaries to determine their meaning, *Gemini*, 231 A.3d at 849. In addition, individual terms and provisions cannot be read in isolation; the policy must be considered as a whole. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014).

The insured bears the initial burden of showing that its claims are "within the policy's affirmative grant of coverage." *Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) (quoting *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)). Thus, to withstand a Rule 12(b)(6) motion, the policy holder

5

"must plausibly plead not only that it has an insurance contract but that the contract covers its claimed injuries." *Penn Asian Senior Servs. v. Selective Ins. Co. of S.C.*, No. 20-4919, 2021 WL 4478215, at *1 (E.D. Pa. Sept. 30, 2021).

IV

Steadfast first argues that Greenwood's claims against it must be dismissed because it does not plausibly allege a "new pollution event" occurred at any of its covered locations, a prerequisite to coverage under the policy. The Court agrees.

Greenwood's policy defines a pollution event as "the discharge, dispersal, release, or escape of any . . . irritant, contaminant or pollutant . . . into or upon land, or any structure on land, [or] the atmosphere . . . in concentrations or at levels in excess of those naturally present in the environment." (Amendatory Endorsement § III.FF, at 456.) It includes "any 'microbial substances' that are present on, at or within any buildings or other structures at a 'covered location.'" (*Id.*) Under the policy, viruses are "microbial substances." (Z Choice Real Estate Environmental Liability § III.X, at 417.) A "new" pollution event is one that first occurs during the policy period. (*Id.* § III.BB, at 417.) Given the policy's expansive definition of a new pollution event, Greenwood need only allege that a virus was present in a building at a covered location during the policy period. It fails to do so.

A

Greenwood alleges that "actual incidents of COVID-19 were detected at certain covered locations" because "from time to time, employees from certain covered locations have tested positive for COVID-19." (Compl. ¶ 168). But is impossible to conclude from this vague assertion that coronavirus was detected at its covered locations *during the*

6

*policy period*. Greenwood's Complaint covers events from March 13 of 2020 to at least March 8 of 2021. *Compare* (Compl. ¶ 162 *with id.* ¶ 171). By contrast, the environmental liability policy period expired on April 1, 2020. (Z Choice Real Estate Environmental Liability Declarations, Item 2, at 409.) Because of the broad temporal sweep of the Complaint, Greenwood's assertion that employees tested positive "from time to time" says little about whether the virus was actually present during the last three weeks of March, the only period where the presence of infected workers at a covered location could have caused a covered pollution event. And as Greenwood acknowledges, only a "minimal number" of employees were working during the early days of the pandemic. (Compl. ¶ 166.)

Other courts have dismissed similarly vague claims. In *DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*, No. 20-3606, 2021 WL 1232778, (S.D. Tex. Mar. 12, 2021), for example, the court held coronavirus was not present at the covered location based on allegations that three of the plaintiff's employees tested positive because the plaintiff failed to specify whether those employees had been at work near the time of their positive tests. *Id.* at 5. The fact that employees contracted COVID-19 at some unspecified time could not establish that the coronavirus was actually present at the covered property. *Id; see also Johnson v. Hartford Fin. Servs. Grp., Inc.*, No. 20-2000, 2021 WL 37573, at *5 (N.D. Ga. Jan. 4, 2021) (dismissing complaint that did not identify any employee or patient whose COVID-19 was connected to the covered properties).

Greenwood's other allegations are even more speculative. It claims that it is "a virtual certainty" that coronavirus was present during the policy period because of "the

7

prevalence of Coronavirus in the communities where Greenwood's covered properties are located and the positive test results of certain of Greenwood's employees." (Compl. ¶ 202.) But again, it fails to provide any specifics about when or where these employees tested positive, making it impossible to infer the coronavirus was actually present during the covered time period. Nor is the high rate of COVID-19 in the community sufficient to establish that the coronavirus was present at Greenwood facilities. *See Cafe Plaza de Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1014 (D.N.M. 2021) (rejecting the "conclusory argument that the widespread existence of the virus locally . . . makes it "reasonable" to infer that the virus was present on the premises"); *Johnson*, 2021 WL 37573, at *5 (referring to similar allegations as "conjecture and speculation"). The speculative nature of these assertions is reinforced by the fact that Greenwood's facilities were closed to the public for most of the relevant period. (Compl. ¶¶ 162–64, 170.)

B

Nor is the mere risk that coronavirus might be present at a covered location a pollution event. The policy's definition of "pollution event" requires the actual presence of a contaminant or pollutant. "Pollution event" is defined as the "discharge, dispersal, release, or escape" of a contaminant or pollutant, not the risk or potential that those things might happen. (Amendatory Endorsement § III.FF, at 456.) These words would have no meaning if a pollution event could occur without anything actually being discharged, dispersed, released, or escaping into or from a covered location. Similarly, a pollution event only occurs if the contaminant is present "in concentrations . . . in excess of those naturally present in the environment." This language is incompatible

with a definition of pollution event that encompasses potential contaminants in addition to actual ones. Perhaps most significantly, the policy explicitly includes only microbial substances that are "present" at the covered location. (*Id.*) The potential cycle of "person to person and surface to person infection" that might have taken place had Greenwood stayed open is not a pollution event. (Compl. ¶ 211.)

V

Greenwood then attempts to argue that it is entitled to emergency expenses even if no pollution event occurred. (Pls.' Mem. Opp'n Mot. Dismiss at 12–14, ECF No. 20.) Emergency expenses are "costs, charges and expenses incurred to avoid or otherwise mitigate an actual imminent and substantial endangerment to the public health." (Amendatory Endorsement § III.L, at 456.) In Greenwood's view, because emergency expenses include costs incurred to "avoid . . . an imminent" endangerment to the public health, they must extend to precautionary measures taken to prevent a pollution event from occurring in the first place. (Pls.' Mem. at 12–13.)

A

This interpretation is inconsistent with the policy. *See Riccio v. Am. Republic Ins. Co.,* 705 A.2d 422, 426 (Pa. 1997) ("[A]n insurance policy, like every other written contract, must be read in its entirety and [its] intent . . . gathered from consideration of the entire instrument."). The policy is clear: all "cleanup costs," including emergency expenses, must "result[] from a 'new pollution event.'" (Extended Reporting Period § I.B.1, at 444.) In other words, coverage is limited to costs that were caused by a pollution event at a covered location. *See Cher-D, Inc. v. Great Am. All. Ins. Co.*, No. 05-5936, 2009 WL 943530, at *6 (E.D. Pa. Apr. 7, 2009) ("The Supreme Court of

9

Pennsylvania has interpreted the words 'resulting from' in an insurance contract as meaning proximate causation."); *Bowers v. Great E. Cas. Co.*, 260 Pa. 147, 151 (1918) (concluding that the phrase "resulting from wholly or in part" requires the condition referred to be at least "a remote or proximate cause" of the occurrence at issue).

This does not render meaningless the words "avoid" and "imminent," it simply recognizes that the policy covers efforts to avoid the imminent risks of endangerment presented by pollution events, not to avoid pollution events in the first place. If there was no pollution event, there can be no coverage.

B

Greenwood maintains that a literal interpretation of its emergency expenses coverage violates Pennsylvania public policy. (Pls.' Mem. at 15–16.) A line of Pennsylvania cases establish that third-party liability insurers may be liable for measures policyholders take to mitigate hazardous conditions on their own land that present an imminent and substantial threat to the property of third parties, even if the policy excludes damage to the insured's own property. *See e.g., Leebov v. U. S. Fid. & Guar. Co.*, 165 A.2d 82, 84 (Pa. 1960); *Redevelopment Auth. of City of Philadelphia v. Ins. Co. of N. Am.*, 675 A.2d 1256, 1259 (Pa. Super. Ct. 1996); *Lehigh Elec. & Eng'g Co. v. Selected Risks Ins. Co.*, 30 Pa. D. & C.3d 120, 122 (Ct. C.P. Luzerne Cnty. 1982).

*Leebov* and its progeny do not control this case. First, these cases dealt with situations in which the insured was under a legal obligation to repair third-party property damage caused by the mitigated condition. *See Interstate Fire & Cas. Co. v. B.T. Washington, Inc.*, No. 94-232, 1995 WL 273643, at *4 (E.D. Pa. May 5, 1995); *Consol. Rail Corp. v. Certain Underwriters at Lloyds*, No. 84-2609, 1986 WL 6547, at *4

10

(E.D. Pa. June 5, 1986). As a consequence, "the insured's actions were notedly designed to save both the insured and the insurer from . . . claims that would have resulted in the absence of remedial measures." *Lehigh Elec.*, 30 Pa. D. & C.3d at 126. Here, Greenwood does not allege that it would have been legally required to compensate anyone had it not taken the precautionary measures it did. It is not even clear that its own expenses would have been higher had coronavirus actually been detected as its facilities. *See* (Compl. ¶ 168).

Second, each of these cases involved contamination that had already damaged the insured's property. *See Leebov*, 165 A.2d at 83 (landslide); *Redevelopment Auth.*, 675 A.2d at 1257 (contamination from petroleum products); *Lehigh Elec.*, 30 Pa. D. & C.3d at 122 (chemical spill); *Aronson Assocs., Inc. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 14 Pa. D. & C.3d 1, 3 (Ct. C.P. Dauphin Cnty. 1977) (gasoline spill); *Sunoco, Inc. v. Illinois Nat. Ins. Co.,* No. 04-4087, 2007 WL 127737, at *1 (E.D. Pa. Jan. 11, 2007) (chemical spill). There is no indication that the Pennsylvania Supreme Court would extend *Leebov* to situations where the insured took steps to mitigate a threat that had yet to appear on its own property, much less pose a risk to its neighbors.

Third, the "emergency expenses" provision provides Greenwood with better coverage than the policies at issue in *Leebov* and the cases following it. Those cases expanded third-party liability coverage to cover costs incurred to mitigate "an imminent threat of substantial harm to others" that, if realized, the insured and insurer would be obligated to pay for. Greenwood, on the other hand, is entitled to reimbursement for costs incurred to avoid or mitigate "an actual imminent and substantial endangerment to the public health or the environment" regardless of whether it is legally obligated to

11

redress any harm that might occur if the danger goes unmitigated.  Greenwood already has the benefit of the protection *Leebov* offers, plus more.  The Court will not "expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002).

VI

Greenwood's environmental liability policy also covers "reasonable and necessary costs . . . incurred in the investigation, removal, remediation . . . neutralization or immobilization of . . . contamination" if those costs are "required by" a governmental authority and  "result[] from" a new pollution event at a covered location.  (Amendatory Endorsement § III.F.1, at 455; Extended Reporting Period § I.B.1, at 444.)  Greenwood's Complaint fails to allege that either of these conditions were satisfied.

A

Again, cleanup costs are only covered "to the extent [they] result[] from a 'new pollution event'" at or emanating from a covered location.  (Extended Reporting Period § I.B.1, at 444.)  Costs that Greenwood would have incurred absent a pollution event do not "result from" a pollution event and are not covered.  *See Another Planet Ent., LLC v. Vigilant Ins. Co.*, No. 20-07476, 2021 WL 774141, at *1 (N.D. Cal. Feb. 25, 2021).

Greenwood does not allege that any governmental authority required it to take any action in response to the actual presence of coronavirus at its facilities.  Instead, it alleges that it was required to suspend its operations because of the likelihood that coronavirus would be present "wherever people are located or congregate."  (Comp. ¶¶ 209–11.)  But as previously discussed, the policy's definition of "pollution event" requires the actual presence of the virus.  Potentialities and probabilities are not

enough.  State and local orders responding to nothing more than a generalized concern about person to person and surface to person spread do not "result from" a pollution event.

The government orders referenced in Greenwood's Complaint applied to it whether or not coronavirus was actually present at its covered locations.  Greenwood lists a variety of government pronouncements that encouraged or required Greenwood to close its operations in Pennsylvania, (Compl. ¶¶ 150–56, 160), but nowhere does it claim that that it was subject to these orders because coronavirus was actually present at its facilities.  Instead, they applied to entire industries, regardless of whether coronavirus was ever detected.  (Compl. ¶¶ 151–54.)  Because Greenwood would bear the costs of complying with these orders even if it never experienced a pollution event, they are not covered by its policy.

B

Even if Greenwood plausibly pleaded that the orders resulted from a covered pollution event, it does not allege that these orders imposed any covered costs.  The policy's definition of cleanup costs includes "costs, charges and expenses."  These terms, especially in combination, refer to money spent, not revenue lost.  *See Cost, Black's Law Dictionary* (11th ed. 2019) ("[t]he amount paid or charged for something"); *Expense, id.* ("[a]n expenditure of money, time, labor, or resources to accomplish a result"); *Charge, id.* ("[p]rice, cost, or expense").  This understanding is reinforced by Greenwood's separate coverage for loss of business income.  *Compare* (Amendatory Endorsement § III.F.1, at 455 *with* Coverage D: Suspension of Operations, § II, at 448–49  (defining "loss of business income" and "other loss")).  If the phrase "costs, charges and expenses"

13

included Greenwood's losses, it would render the suspension of operations endorsement superfluous. As a consequence, "cleanup costs" coverage extends only to expenditures required by governmental authorities, not to other losses occasioned by their orders.

While Greenwood alleges that it incurred substantial costs "at the direction of governmental authorities," it does not specify what those costs were or what authority required it to incur them. (Compl. ¶ 161.) This conclusory assertion is not enough to state a claim for coverage under the environmental policy. Greenwood must allege facts that link its expenditures to applicable government orders. But it does not claim that any of the orders listed in the Complaint required Greenwood to spend any money. They merely required the facilities to close. (Compl. ¶ 154.) And where Greenwood does specify expenses incurred responding to the threat of the coronavirus, it fails to connect them to a government order. (Compl. ¶ 167.)

## VII

Finally, Greenwood does not allege facts that could entitle it to coverage under the suspension of operations endorsement. The endorsement only covers lost business income if a pollution event "directly causes" a suspension of operations at a covered location, the event triggers cleanup costs coverage under the policy, and the suspension is the direct result of a government mandated cleanup. (Coverage D: Suspension of Operations, §§ I.D.2, II, at 448–50.) As previously discussed, Greenwood does not allege facts to establish that any of these criteria were satisfied. Without sufficient factual allegations that Greenwood experienced a qualifying pollution event or performed any government mandated clean-up, it cannot claim coverage under this provision.

VIII

Courts should freely give leave to amend a complaint when justice so requires. Fed. R. Civ. P. 15(a)(2). "This certainly includes amendment to cure defective allegations." *Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) (citing 6 Wright & Miller, *Federal Practice and Procedure* § 1474 (3d ed. 2019)). Greenwood requests, if necessary, leave to amend. (Pls.' Mem. at 24.) It will be allowed to do so to the extent it can plausibly show it is entitled to recover under the policy.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT