**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREENWOOD RACING INC., GREENWOOD GAMING AND ENTERTAINMENT, INC., RACETRACK OP CO., CITY TURF CLUB OP CO., TURF CLUB OP CO., and ACRA TURF CLUB, LLC,<br>        *Plaintiff*,<br><br>    v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY<br><br>        *Defendants*. | CIVIL ACTION<br>NO. 21-1682 |

**PAPPERT, J.**                                                                                 September 12, 2022

**MEMORANDUM**

Greenwood Racing Inc. and its subsidiaries (collectively "Greenwood") sued American Guarantee and Liability Insurance Company and Steadfast Insurance Company seeking a declaration that the Defendants are required to insure losses sustained by Greenwood as a result of the Coronavirus pandemic and resulting government actions. The Court previously granted Steadfast's motion to dismiss Greenwood's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF 29.) American Guarantee now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Court grants the motion, consistent with similar decisions in this and other Circuits.[1]

---

[1] *See, e.g., SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, 36 F.4th 23, 27 (1st Cir. 2022); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 222 (2d Cir. 2021); *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 456 (5th Cir. 2022); *Santo's Italian Café LLC v.*

I

Greenwood owns and operates a casino, racetrack and other gambling facilities in Pennsylvania and New Jersey, including Parx Casino, Parx Racing, South Philadelphia Race & Sportsbook, Oaks Race & Sportsbook, and Favorites at Egg Harbor Township. (Compl. ¶¶ 1, 22-27, ECF 1-3.) In mid-March of 2020, the COVID-19 pandemic and subsequent government actions brought these businesses to a sudden halt. (*Id.* ¶¶ 161–64, 170.) Two of Greenwood's facilities, Parx Racing and Oaks Race & Sports Book, closed on March 13. (*Id.* ¶¶ 33, 35.) Its two other Pennsylvania locations, Parx Casino and South Philadelphia Race & Sportsbook, closed on March 15. (*Id.* ¶¶ 32–34.) These locations remained closed for several months. (*Id.* ¶¶ 32–36.)

---

*Acuity Ins. Co.*, 15 F.4th 398 (6th Cir. 2021); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 330 (7th Cir. 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 15 F.4th 885 (9th Cir. 2021); *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 710, (10th Cir. 2021); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, 2021 WL 3870697 (11th Cir. Aug. 31, 2021); *Newtown Athletic Club v. Cincinnati Ins. Cos.*, No. 21-2662, 2022 WL 866410, at *6 (E.D. Pa. Mar. 23, 2022); *KWB Enterprises, Inc. v. Nationwide Gen. Ins. Co.*, No. 20-5195, 2022 WL 282533, at *1 (E.D. Pa. Jan. 31, 2022); *Moody v. Hartford Fin. Grp., Inc.*, 513 F. Supp. 3d 496, 505 (E.D. Pa. 2021); *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, 503 F. Supp. 3d 251, 253 (E.D. Pa. 2020); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, 96 (E.D. Pa. 2020); *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 618 (E.D. Pa. 2020); *BSD-360, LLC v. Phila. Indem. Ins. Co.*, 580 F. Supp. 3d 92, 94 (E.D. Pa. 2022); *Big Red Mgmt. Corp. v. Zurich Am. Ins. Co.*, 579 F. Supp. 3d 665, 667 (E.D. Pa. 2022); *Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se.*, 516 F. Supp. 3d 450, 457 (E.D. Pa. 2021) *Lansdale 329 Prop., LLC v. Hartford Underwriters Ins. Co.*, 537 F. Supp. 3d 780, 781 (E.D. Pa. 2021); *TAQ Willow Grove, LLC v. Twin City Fire Ins.*, 513 F. Supp. 3d 536, 547 (E.D. Pa. 2021); *Spring House Tavern, Inc. v. Am. Fire & Cas. Co.*, 544 F. Supp. 3d 517, 523-26 (E.D. Pa. 2021); *Shantzer v. Travelers Cas. Ins. Co. of Am.*, 531 F. Supp. 3d 920, 924 (E.D. Pa. 2021); *Tria WS LLC v. Am. Auto. Ins. Co.*, 530 F. Supp. 3d 533, 540 (E.D. Pa. 2021); *Ultimate Hearing Sols. II, LLC v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 549, 563 (E.D. Pa. 2021); *Indep. Rest. Grp. v. Certain Underwriters at Lloyd's, London*, 513 F. Supp. 3d 525, 532 (E.D. Pa. 2021); *ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 513, 520 (E.D. Pa. 2021); *4431, Inc. v. Cincinnati Ins. Cos.*, 504 F. Supp. 3d 368, 383 (E.D. Pa. 2020); *Paul Glat MD, P.C. v. Nationwide Mut. Ins. Co.*, 531 F. Supp. 3d 908, 910 (E.D. Pa. 2021); *Maggios Famous Pizza, Inc. v. Selective Ins. Co. of the Sw.*, No. 20-2603, 2021 WL 6051562, at *1 (E.D. Pa. Dec. 21, 2021); *Del. Valley Mgmt., LLC v. Cont'l Cas. Co.*, 572 F. Supp. 3d 119, 124 (E.D. Pa. 2021); *Boscov's Dep't Store, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 546 F. Supp. 3d 354, 359 (E.D. Pa. 2021).

Oaks Race & Sportsbook never reopened.  (*Id.* ¶ 35.)  Greenwood suffered financial losses as a result of these closures, as well as from the additional costs of sanitizing and reorganizing its facilities to make them safer for its patrons and employees.  (*Id.* ¶¶ 167-168.)

During this time, Greenwood's properties were insured under two Zurich EDGE All-Risk Policies American issued to Greenwood.  (*Id.* ¶¶ 38, 40, 43-44.)  The Policies' periods ranged from April 1, 2019, to April 1, 2020, and then from April 1, 2020, to April 1, 2021.  (*Id.*)  Except for an increase in the coverage limits, the Policies are identical for all relevant purposes.  (*Id.* ¶ 42.)  The Policies each state: "This Policy Insures against direct physical loss of or damage caused by a **Covered Cause of Loss**[2] to Covered Property, at an Insured Location . . . subject to the terms, conditions and exclusions stated in this Policy."  (Zurich EDGE Policy § 1.01, ECF 1-4 at 75.)[3]  The Policies define "Covered Cause of Loss" as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."  (*Id.* § 7.11, at 120.)  Additionally, the Policies contain "Time Element Coverages" (business interruption), and "special coverages" such as "Civil or Military Authority" and "Ingress/Egress" coverage which, as Greenwood agrees, all require direct physical loss of or damage to a covered property to trigger coverage.  *See* (Pls.' Mem. Opp'n Def.'s Mot. J. Pleadings at 3, ECF 38; Zurich EDGE Policy § 4.01.01, at 86, § 5.02.03, at 92, § 5.02.15, at 97).

---

[2] The Policies use bold text when mentioning a defined term.

[3] The page numbers provided in citations to Greenwood's Zurich EDGE Policies all refer to the page numbers in Exhibit B—State Court Filings, ECF 1-4.

The Policies contain numerous exclusions, including a Contamination Exclusion, which excludes from coverage: "**Contamination**, and any cost due to Contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy . . . ." *See* (Zurich EDGE Policy § 3.03.01.01, at 83.) Contamination is defined as "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, [or] disease causing or illness causing agent . . . ." (*Id.* § 7.09, at 120) (emphasis added).

Greenwood contends its economic losses fall within the scope of the Policies' coverage and that the Contamination Exclusion does not apply. (Compl. ¶¶ 222, 273.) American argues there is no direct physical loss of or damage to any covered property that would trigger any additional coverage beyond that provided for "Notifiable Diseases," and the Contamination Exclusion applies to Greenwood's losses.[4] (Def.'s Mot. J. Pleadings at 8, 16-17, ECF 37-1.)

II

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The pleadings are closed after an answer is filed and after a reply is filed to any additional claims asserted in the answer. *Austin Powder Co. v. Knorr Contracting, Inc.*, No. 08-1428, 2009 WL

---

[4] American paid Greenwood $5,000,000 under the Policies' "Notifiable Disease" coverage, which provides for losses that arise from "Notifiable Diseases" that "cause[] restrictions on the use" of covered property "on the order of the competent local authority." (Compl. ¶¶ 253-256; Def.'s Mot. J. Pleadings at 3, ECF 37-1.) Unlike all other coverages listed above, the "Notifiable Disease" agreement does not require direct physical loss or damage to the insured property. *See* (Compl. ¶ 86; Def.'s Mot. J. Pleadings at 3 n.2, ECF 37-1.)

773695, at *1 (M.D. Pa. Mar. 20, 2009). Under Rule 12(c), a judgment on the pleadings will be granted "only if, viewing all the facts in the light most favorable to the nonmoving party, no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3d Cir. 2012); *see also Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005).

A district court applies the same standard to a judgment on the pleadings as it does to a motion to dismiss pursuant to Rule 12(b)(6). *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991) ("Rule 12(h)(2) provides that a defense of failure to state a claim upon which relief can be granted may also be made by a motion for judgment on the pleadings. In this situation, we apply the same standards as under Rule 12(b)(6)."). To survive dismissal under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to

5

those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation marks and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

### III

Under Pennsylvania law, insurance policies are contracts between insurer and policy holder. *Kurach v. Truck Ins. Exch.*, 235 A.3d 1106, 1116 (Pa. 2020). Their proper interpretation is a question of law for the court to decide. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). In doing so, courts must "effectuate the intent of the contracting parties as reflected by the written language of the insurance policies." *Kurach*, 235 A.3d at 1116. Where the terms of the policy are unambiguous, courts will give them their plain and ordinary meaning, unless doing so would violate clearly established public policy. *Id.* Where they are ambiguous, they must be construed in favor of the policyholder. *Id.*

Language in a policy is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* A word is not ambiguous, however, simply because it is undefined. *Gemini Ins. Co. v. Meyer Jabara Hotels LLC*, 231 A.3d 839, 849 (Pa. Super. Ct. 2020). Instead, "words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999). In addition, individual terms and provisions cannot be read in isolation; the policy must be considered as a whole. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014). Finally, the insured bears the initial burden of showing that its claims are "within the policy's affirmative

grant of coverage." *Sciolla v. W. Bend Mut. Ins. Co.*, 987 F. Supp. 2d 594, 599 (E.D. Pa. 2013) (quoting *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)). Exclusions, meanwhile, are strictly construed against the insurer. *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998).

IV

For the Court to find coverage under any of the Policies' provisions at issue, Greenwood must plausibly allege "direct physical loss of or damage caused by a **Covered Cause of Loss** to a Covered Property" as outlined in the Policies. (Zurich EDGE Policy § 1.01, ECF 1-4 at 75.) Greenwood argues that the "inability of the Properties to function as intended was the 'direct physical loss of' the Properties" and that "[t]his alone satisfies the standard adopted by the Third Circuit to trigger coverage for invisible hazards under Pennsylvania law." (Pls.' Mem. Opp'n Def.'s Mot. J. Pleadings at 9, ECF 38.) Greenwood also states that the phrase "direct physical loss of or damage" is not defined in the policy. (Compl. ¶ 61). First of all, that alone does not make these terms ambiguous. *See Gemini Ins. Co. v. Meyer Jabara Hotels LLC,* 231 A.3d 839, 848 (Pa. Super. Ct. 2020) (The "lack of a definition for an operative term . . . does not necessarily render the policy ambiguous."). Second, Greenwood mischaracterizes the Third Circuit's standard and misstates the plain meaning of physical loss and damage in the context of unseen hazards.

In the Third Circuit, "[i]n ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure." *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) (quoting 10 Couch on Ins. § 148:46 (3d ed.1998)). "Fire, water, smoke and

impact from another object are typical examples of physical damage from an outside source that may demonstrably alter the components of a building and trigger coverage. Physical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." *Id.*

Specifically, absent identifiable damage to a covered property, physical loss only occurs when an unseen hazard exists in such a quantity that it renders the property physically uninhabitable and unusable. *See Port Auth.*, 311 F.3d at 236; *4431, Inc. v. Cincinnati Ins. Cos.*, 504 F. Supp. 3d 368, 383 (E.D. Pa. 2020) ("To constitute direct 'physical loss' . . . under Pennsylvania law, economic loss resulting from an inability to utilize a premises as intended must (1) bear some causal connection to the *physical* conditions of that premises, which conditions (2) operate to completely or near completely preclude operation of the premises as intended."); *Lansdale 329 Prop., LLC v. Hartford Underwriters Ins. Co.*, 537 F. Supp. 3d 780, 781 (E.D. Pa. 2021) ("Direct physical loss . . . exists when a structure has been rendered 'uninhabitable and unusable.'") (quoting *Port Auth.*, 311 F.3d at 235).

## A.

Greenwood has not alleged that the Coronavirus physically altered or damaged its properties, nor that the Coronavirus was or is present in quantities of such magnitude that it could render Greenwood's properties unusable or uninhabitable. Greenwood claims that "from time to time, employees from certain covered locations have tested positive for Covid-19." (Compl. ¶ 168.) But beyond these cursory allegations—about people who may have become infected outside of Greenwood's

8

properties—Greenwood has not plausibly alleged that the Coronavirus rendered its properties unusable to the requisite degree.

Greenwood argues that they have sustained direct physical loss of or damage to their properties because the physical presence or threat of the Coronavirus has prevented those properties from functioning as intended. *See* (Pls.' Mem. Opp'n Def.'s Mot. J. Pleadings at 9, ECF 38). Citing a City of Philadelphia Emergency Order, Greenwood contends "Covid-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain property and places." (*Id.* ¶ 141a.) From this and other government statements, Greenwood concludes that "[r]espiratory droplets" containing the Coronavirus "physically change the property and its surface by becoming part of that surface." (Compl. ¶ 136.)

Such conclusions fail to plausibly allege that the Coronavirus caused direct physical loss or damage to Greenwood's properties. Even if viruses live on surfaces and can be transferred to humans who come into contact with those surfaces, viruses do not *damage* or affect a property in ways that would render it physically unusable or uninhabitable. Indeed, Greenwood acknowledges that the "costs to cleanup, remove, and remediate the actual and/or potential presence of Coronavirus" led to its additional expenses and that any "altering of the environment" that the Coronavirus may cause only lasts "until such time as that location is either sufficiently quarantined or disinfected." (Compl. ¶¶ 138, 168.) That surfaces are made usable after disinfection undercuts Greenwood's allegation that the Coronavirus, let alone the threat of the virus, rendered its properties unusable to the degree required for coverage under

Pennsylvania law.[5] *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) ("[R]outine maintenance" that was required as a result of the presence of asbestos did "not bring the expense within first-party coverage."); *see also Mama Jo's Inc. v. Sparta Ins. Co.,* 823 F. App'x 868, 879 (11th Cir. 2020) ("[A]n item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'").

B.

Greenwood next argues that "even if [its] properties did not suffer physical 'damage,' the Property Policies still provide coverage for the *risk* of Greenwood's physical 'loss' of its property." (*Id.* ¶ 55) (emphasis added). Specifically, Greenwood contends that the Policies "insure 'all risks,' such as threats 'of direct physical loss of or damage to' Greenwood's covered properties . . . ." (Compl. ¶ 48.) Greenwood asserts the Policies' inclusion of the phrase "all risk," which is found in the definition of Covered Cause of Loss, means that losses suffered due to the "risk" of coronavirus are covered. (*Id.* ¶ 47-55.)

The Policies cover "loss of" or "damage" to covered properties (Zurich EDGE Policy § 1.01, ECF 1-4 at 75), not a mere risk absent a showing of direct, physical loss or damage. Greenwood conflates the Policies' definition of "Covered *Cause* of Loss," with

---

[5] The fact that "[a] minimal number of employees worked onsite at Parx Racing and Parx Casino to perform cleaning and disinfecting" work and to perform "security services" also undermines the alleged uninhabitability of Greenwood's properties. (Compl. ¶ 166.) This is not the only time Greenwood acknowledges the functionality of its properties in its Complaint. On the one hand, Greenwood alleges that "Coronavirus is likely (if not certain) to be present wherever people are located and congregate." (Compl. ¶ 139). On the other hand, Greenwood asserts that most of its properties have been reopened since January 2021, despite the "continuing pandemic." (Compl. ¶ 170-171). Greenwood's ability to access its properties indicates habitability; its ability to disinfect and operate its properties indicates usability. Both prevent Greenwood from alleging physical loss of or damage to its property.

what the Policies' actually cover: "[D]*irect physical loss of or damage* caused by a **Covered Cause of Loss** to Covered Property." (*Id.*) (emphasis added). "Covered Cause of Loss" is defined as "[a]ll risks of direct physical loss of or damage . . . ." (*Id.* § 7.11, at 120.)  But "individual terms and provisions cannot be read in isolation; the policy must be considered as a whole. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014).  Under the Policies' plain terms, there is no coverage unless there is (1) direct physical loss of or damage to Greenwood's properties, and (2) that physical loss or damage is caused by a Covered Cause of Loss.  A *risk* of loss or damage isn't enough.  Greenwood must plausibly allege demonstrable, physical loss or damage to their properties, something they have not done.  As a result, there is no coverage for Greenwood's losses under any policy provision, including the "Time Element" and "special coverages" provisions.

V

Even if the Coronavirus and resulting government actions caused direct physical loss or damage to Greenwood's properties, the Policies' Contamination Exclusion bars Greenwood's claims.  Again, that provision excludes: "**Contamination**, and any cost due to Contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. . . ." (Zurich EDGE Policy §§ 3.03.01, 3.03.01.01, ECF 1-4 at 83.)  Contamination is defined as "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, [or] disease causing or illness causing agent . . . ." (Zurich EDGE Policy §7.09, ECF 1-4

11

at 120) (emphasis added). The Coronavirus—a virus—unambiguously falls within this exclusion, something many other courts have also concluded.[6]

Greenwood argues for the application of the "Louisiana Endorsement," which does not include "viruses" in its definition of "Contaminant" or "Contamination," even though "viruses" are included in the Policies' main definition of "Contamination." *See* (Compl. ¶ 184; Pls.' Mem. Opp'n Def.'s Mot. J. Pleadings at 22, ECF 38). Greenwood acknowledges that the base Zurich EDGE policy form includes "virus[es]" in the definition of "Contamination," (Compl. ¶ 224) but would have the Court use the Louisiana Endorsement's definition of contaminant. (Compl. ¶ 225, 231). The Court, as have others, declines to do so. *See Dana Inc. v. Zurich Am. Ins. Co.*, No. 21-4150, 2022 WL 2452381, at *4 (6th Cir. July 6, 2022) (finding that the Policies simply do "not contain the Louisiana amendment."); *AECOM v. Zurich Am. Ins. Co.*, No. 21-00237, 2021 WL 6425546, at *10 (C.D. Cal. Dec. 1, 2021) (finding that application of the

---

[6] *See, e.g., Boscov's Dep't Store, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 546 F. Supp. 3d 354, 368 (E.D. Pa. 2021) (finding that Plaintiff's claims would be barred by the same Contamination Exclusion, even if Plaintiff could plausibly allege coverage.); *Dana Inc. v. Zurich Am. Ins. Co.*, No. 21-4150, 2022 WL 2452381, at *2 (6th Cir. July 6, 2022) ("Based on [the Exclusion's] plain language, the contamination exclusion applies throughout the policy, including to the time element section," so coverage was properly denied.); *Carilion Clinic v. Am. Guarantee & Liab. Ins. Co.*, No. 21-00168, 2022 WL 347617, at *17 (W.D. Va. Feb. 4, 2022) ("[T]he Contamination Exclusion applies to bar . . . [Plaintiff's] losses attributable to the COVID-19 pandemic . . . ."); *Lindenwood Female Coll. v. Zurich Am. Ins. Co.*, 569 F. Supp. 3d 970, 977 (E.D. Mo. 2021) ("It is clear therefore that the Contamination Exclusion applies to both the Property Damage and Time Element coverages provided for therein."); *AECOM v. Zurich Am. Ins. Co.*, No. 21-00237, 2021 WL 6425546, at *11 (C.D. Cal. Dec. 1, 2021) ("[T]he Contamination Exclusion applies and precludes coverage of any direct physical loss or damage caused to Plaintiff's property by the COVID-19 virus."); *Manhattan Partners, LLC v. Am. Guarantee & Liab. Ins. Co.*, No. 20-14342, 2021 WL 1016113, at *2 n.3 (D.N.J. Mar. 17, 2021) ("A final bar to Plaintiffs' claims can be found in the Policy's Contamination exclusion, which clearly and explicitly excludes coverage for damage, loss or expense arising from a virus.").

"Louisiana Endorsement" would necessitate application of each state-specific endorsement and "lead to confusion."); *Carilion Clinic v. Am. Guarantee & Liab. Ins. Co.*, No. 21-00168, 2022 WL 347617, at *15 (W.D. Va. Feb. 4, 2022) ("[The Louisiana Endorsement] plainly is limited to property located there.").

VI

Greenwood seeks leave to amend to "bolster" its Complaint. (Pls.' Mem. Opp'n Def.'s Mot. J. Pleadings at 17, ECF 38.) Greenwood claims it can allege a further "presence of the virus at its Properties, including specific facts supported by biostatistical and scientific analysis," as well as additional allegations regarding the Coronavirus, such as how it moves through the air and how it is "impractical to remove Coronavirus from the air in large spaces . . . ." (*Id.* At 17-18).

Courts should freely give leave to amend a complaint when justice so requires. Fed. R. Civ. P. 15(a)(2). "[W]hen a complaint is vulnerable to dismissal on the pleadings, "a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Andela v. Am. Ass'n For Cancer Rsch.*, 389 F. App'x 137, 142 (3d Cir. 2010) (quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 236 (3d Cir. 2008). "This is true even where the plaintiff's failure to state a claim is raised in a defendant's Rule 12(c) motion." *Hu v. Herr Foods, Inc.*, 251 F. Supp. 3d 813, 824 (E.D. Pa. 2017).

No additional allegations about the Coronavirus and its purported presence at Greenwood's properties, including "biostatistical or scientific analysis," could establish direct physical loss of or damage to those properties. Even if Greenwood could somehow allege direct physical loss or damage, the Contamination Exclusion would

13

preclude coverage.  *See Boscov's,* 546 F. Supp. 3d at 370 ("Any new allegations regarding the "actual presence" of COVID-19 at [Plaintiff's] properties would fall squarely within the reach of the Policy's Contamination Exclusion.").  As such, further amendment would be futile.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.